# HELENE E. GEORGE *v.* DONALD W. ERICSON
## (SC 15808)

Callahan, C. J., and Borden, Berdon, Norcott, Palmer, McDonald and Peters, Js.

Argued September 29, 1998—officially released August 24, 1999

*Charles W. Fleischmann,* for the appellant (plaintiff).

*Thomas M. Murtha,* with whom was *Michael O. Connelly,* for the appellee (defendant).

*Opinion*

BORDEN, J. The principal issue in this appeal is whether the evidentiary rule barring the admission of the testimony of a nontreating physician, as previously articulated by this court in *Brown* v. *Blauvelt,* 152 Conn. 272, 274, 205 A.2d 773 (1964), should be overruled. The plaintiff, Helene E. George, appeals[1] from the judgment of the trial court, rendered upon a jury verdict. The verdict awarded the plaintiff compensatory economic damages only. Prior to the trial, the court had granted the motion of the defendant, Donald W. Ericson, to preclude the plaintiff from calling a nontreating physician as a witness. We conclude that *Brown* should be overruled, and that the trial court's exclusion of the nontreating physician's testimony was harmful. We therefore reverse the judgment of the trial court and remand the case for a new trial.

The plaintiff brought this negligence action against the defendant for injuries that the plaintiff sustained as a result of a May 13, 1993 collision between the automobiles operated by the plaintiff and the defendant

---

[1] The plaintiff filed an appeal with the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

on Post Road in Bridgeport. The jury rendered a verdict for the plaintiff, and awarded her $12,174 in economic damages, but awarded no noneconomic damages. The plaintiff moved: (1) to set aside the verdict and for a new trial; and (2) for an additur. The trial court denied these motions and rendered judgment on the verdict. This appeal followed.

At trial, both the defendant's liability and the extent of the plaintiff's injuries were contested. To the extent relevant to the principal issue in this appeal, the evidence regarding the plaintiff's injuries, both excluded and admitted, was as follows. The plaintiff was taken from the scene of the accident by ambulance to St. Vincent's Hospital. On the day following the accident, the plaintiff made an appointment with Stuart C. Belkin, an orthopedic surgeon. She consulted with Belkin for the first time several days later. During September, 1993, Belkin performed arthroscopic surgery, under general anesthesia, on the plaintiff's right knee. Belkin treated the plaintiff through December, 1993. In April, 1994, the plaintiff began treatment with Walter T. Shanley, also an orthopedic surgeon. Shanley's son was an acquaintance of the plaintiff, and had referred her to Shanley.

During the trial, neither Belkin nor Shanley[2] testified in person. The medical reports of both physicians were introduced into evidence and read to the jury. With regard to the plaintiff's permanent disabilities, Belkin stated: "As a result of this patient's injuries I give her a 5 percent permanent partial impairment of her cervical spine and a 5 percent permanent partial impairment of her right knee." Shanley opined that "[d]ue to her motor vehicle accident of May 13, 1993, [the plaintiff] is left

---

[2] The parties stipulated before the jury that Shanley was in Ireland during the time of the trial. The record does not indicate the reason that Belkin was not called to testify in person at trial.

with a permanent partial disability of 5 percent to the cervical spine and a permanent partial disability of 20 percent to her right knee."

After the plaintiff had commenced this action, the defendant requested that the plaintiff submit to an independent physical examination[3] by Robert C. George,[4] a physician selected by the defendant. Thereafter, George evaluated the plaintiff. His evaluation was based on a review of the plaintiff's hospital records,[5] a discussion with the plaintiff about her injuries, and a physical examination that included both subjective and objective components. With regard to the plaintiff's permanent injuries, George issued a written report that provided in relevant part: "I have no argument with the permanency rating given to her cervical spine, but would wonder with the history[6] given and the findings at least reported on the original neck films . . . that perhaps 1 percent or 2 percent of the 5 percent should be related to the prior accident and I would certainly at least raise that comment for consideration. With regard to her knee complaints, I think they are very real . . . . Since, in

---

[3] Although not specifically cited in his motion, Practice Book § 13-11 governed the defendant's request. Section 13-11 (b) provides in relevant part: "In the case of an action to recover damages for personal injuries, any party adverse to the plaintiff may file and serve in accordance with Sections 10-12 through 10-17 a request that the plaintiff submit to a physical or mental examination at the expense of the requesting party. . . . Any such request shall be complied with by the plaintiff unless, within ten days from the filing of the request, the plaintiff files in writing an objection thereto specifying to which portions of said request objection is made and the reasons for said objection. . . ."

[4] There is nothing in the record to suggest any familial relationship between the plaintiff and Robert C. George.

[5] These records included a magnetic resonance image (MRI) of the plaintiff's knee, an MRI of her cervical spine, plane films of her cervical spine and plane films of her knee.

[6] The plaintiff's history included a fall resulting in "some right hip complaints," as well as a work related incident involving her lower back. The plaintiff also had incurred several injuries in a March, 1992 automobile accident.

this kind of situation it is really difficult to assess a rating for pain and/or the perception thereof, my calculations come up with a permanency rating of 15 percent, and I am struggling to understand where the 20 percent comes from. I am not necessarily arguing that it is wrong. I am indicating that perhaps the rating surgeon ought to be consulted as to how he arrived at the 20 percent. That would at least form a logical basis for any further discussions, in trying to arrive at a 'fair' figure. . . ."

In his pretrial disclosure of expert witnesses,[7] the defendant had indicated that he planned to call George as an expert witness "to testify as to the examination of the plaintiff . . . including diagnosis, testing and the prognosis for the plaintiff." The plaintiff thereafter subpoenaed George to appear to testify during the trial. As a result of the plaintiff's compliance with the court's trial management order, the defendant was apprised that the plaintiff intended to call George as a witness to testify "as to [the] permanency of [the plaintiff's] neck injury and the permanency of her knee injury based upon his review of records and examination of the plaintiff." In a subsequent trial brief, the defendant no longer listed George in his list of witnesses and further indicated that he would object to George being called as a witness by the plaintiff.

Also, the defendant, relying on our decision in *Brown* v. *Blauvelt*, supra, 152 Conn. 274, filed a motion to preclude the plaintiff from calling George as a witness.

[7] Practice Book § 13-4 (4) provides in relevant part: "[A]ny plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. Each defendant shall disclose the names of his or her experts in like manner within a reasonable time from the date the plaintiff discloses experts, or, if the plaintiff fails to disclose experts, within a reasonable time prior to trial. . . ."

The trial court, after considering the defendant's motion at the commencement of the trial, stated that it was "satisfied that the . . . *Brown* case [was] still good law in this state and that the rationale behind it [was] appropriate to this case." Accordingly, the court granted the defendant's motion.

I

The plaintiff claims that we should overrule *Brown* and permit the introduction of testimony by a nontreating physician regarding his physical examination of a party in a civil action.[8] Specifically, the plaintiff contends that "[w]hen a physician employed by a defendant performs a physical examination of a plaintiff, that physician obtains knowledge which should be available to the jury and not kept from the courthouse because of a single case which has outlived whatever utility it had." Moreover, the plaintiff, in order "[t]o limit the issues necessary to a resolution of the precise question presented," requests only that we overrule *Brown* in the situation in which a plaintiff, at the request of a defendant, is subject to a compulsory examination by a physician. We conclude, however, that *Brown* should be overruled in its entirety, and that the question of the admissibility of the opinion of a physician, whether treating or nontreating, should be governed by the same standards that govern the testimony of expert witnesses generally.

---

[8] The plaintiff also claims that the trial court improperly: (1) refused to issue a missing witness instruction in accordance with *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960); (2) ruled with regard to the admissibility of several other evidentiary items; (3) instructed the jury with regard to the reduction of any award by applicable state and federal taxes; and (4) refused to grant her motion for an additur and her motion to set aside the verdict. The plaintiff, however, expressly requests that we review these issues only if we "find that one or more are likely to occur on retrial . . . ." Because it is not likely that these issues will arise in the new trial, we do not consider these claims.

We begin by recognizing that "[t]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 196, 676 A.2d 831 (1996). Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. *Conway* v. *Wilton*, 238 Conn. 653, 658–59, 680 A.2d 242 (1996). It is the most important application of a theory of decisionmaking consistency in our legal culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value. . . . Id., 658." (Internal quotation marks omitted.) *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 296, 695 A.2d 1051 (1997).

"This court, however, has recognized many times that there are exceptions to the rule of stare decisis. Principles of law which serve one generation well may, by reason of changing conditions, disserve a later one. . . . Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better. . . . The adaptability of the common law to the changing needs of passing time has been one of its most beneficent characteristics. A court, when once convinced that it is in error, is not compelled to follow precedent." (Internal quotation marks omitted.) *Jolly, Inc.* v. *Zoning Board of Appeals*, supra, 237 Conn. 196. "The arguments for adherence to precedent are least compelling, furthermore, when the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants. . . . *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 496 n.5, 408 A.2d 260 (1979), quoting B. Cardozo, [The Nature of the Judicial Process (1921)] p. 151. . . . Rarely do parties contemplate the consequences of tortious conduct, and rarely if at all

will they give thought to the question of what law would be applied to govern their conduct if it were to result in injury." (Internal quotation marks omitted.) *Conway* v. *Wilton*, supra, 238 Conn. 661.

Finally, "[s]tare decisis is not an inexorable command. [*Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 854, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992)]. The court must weigh [the] benefits [of stare decisis] against its burdens in deciding whether to overturn a precedent it thinks is unjust . . . . If law is to have a current relevance, courts must have and exert the capacity to change a rule of law when reason so requires." (Citation omitted; internal quotation marks omitted.) *Conway* v. *Wilton*, supra, 238 Conn. 660. We conclude that the time has come to overrule the evidentiary principle stated in *Brown*.

We recognize that generally this court decides only those issues that the case before us requires us to decide. When we establish new evidentiary rules, however, either by modifying the doctrine of prior case law; see, e.g., *State* v. *Troupe*, 237 Conn. 284, 303–304, 677 A.2d 917 (1996) (limiting constancy of accusation testimony); or by imposing new and different standards of admissibility; see, e.g., *State* v. *Porter*, 241 Conn. 57, 77, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998) (admission of expert scientific testimony); in addition to deciding the case before us, we necessarily give guidance for the future to the trial bench and bar. Accordingly, on some of those occasions, we have addressed issues that, although intertwined with the issues presented by the case immediately before us, did not necessarily need to be decided in that case. Both *Troupe* and *Porter* may be viewed through that prism. Furthermore, as we discuss in part I A of this opinion, the doctrinal underpinning of *Brown* is flawed. We conclude, therefore, that *Brown* should be overruled in its entirety.

In *Brown* v. *Blauvelt,* supra, 152 Conn. 273–74, as in the case before us, a plaintiff, who had sustained injuries in an automobile accident and had been "examined, on behalf of the defendant, by a doctor, solely for the purpose of qualifying him to testify at the trial as a medical expert," had subsequently sought to introduce the testimony of the nontreating physician. Although the trial court initially had allowed this testimony, over the defendant's objection, the trial court later reversed its ruling. Id., 274. In affirming the trial court's judgment, we explained first that "[i]t is the general rule that an expert's opinion is inadmissible if it is based on hearsay evidence. See cases such as *Vigliotti* v. *Campano,* 104 Conn. 464, 465, 133 A. 579 [1926]. One exception to this rule, and the only one bearing on this appeal, is the exception which allows a physician to testify to his opinion even though it is based, in whole or in part, on statements made to him by a patient for the purpose of obtaining from him professional medical treatment or advice incidental thereto." *Brown* v. *Blauvelt,* supra, 274.

We further held, however, that this "exception does not apply . . . where the physician is being consulted, not for purposes of advice or treatment, but merely for the purpose of enabling him to give his opinion as a witness. *Darrigan* v. *New York & N.E.R. Co.,* [52 Conn. 285, 309 (1885)]; *Johnson* v. *Toscano,* 144 Conn. 582, 591, 136 A.2d 341 [1957]; *Zawisza* v. *Quality Name Plate, Inc.,* 149 Conn. 115, 119, 176 A.2d 578 [1961]." *Brown* v. *Blauvelt,* supra, 152 Conn. 274–75. Explaining our conclusion, we stated that "[m]ost exceptions to the hearsay rule are permitted because it is believed that safeguards are present which at least approach those given by the opportunity for cross-examination existing where hearsay testimony is not involved. See cases such as *Ferguson* v. *Smazer,* 151 Conn. 226, 231, 196 A.2d 432 [1963]. In the case of the exception we

are considering, the safeguard is the patient's desire to recover his health, which it is considered will restrain him from giving inaccurate statements to a physician employed to advise or treat him. *Zawisa* v. *Quality Name Plate, Inc.*, [supra, 119] (quoting from the *Darrigan* case). This safeguard is lacking where the physician is employed by the injured party merely to testify on his behalf. [Id.] This is [nonetheless] true where, as here, the physician is employed by, and merely for the purpose of enabling him to testify for, the injured person's adversary. Indeed, there is an especial incentive to inaccuracy and exaggeration in statements made to a physician under such circumstances." *Brown* v. *Blauvelt*, supra, 275.

## A

We conclude that our decision in *Brown* should be overruled for three reasons. First, our holding in *Brown*, even at the time that it was rendered, was based on a faulty premise, namely, that "[i]t [was] the general rule that an expert's opinion is inadmissible if it is based on hearsay evidence." Id., 274. This proposition was incorrect when it was stated, and it remains incorrect today. Although in *Brown* we cited to *Vigliotti* v. *Campano*, supra, 104 Conn. 465, as support for this proposition, *Vigliotti* actually stands for the opposite proposition, namely, that an expert's opinion is not rendered inadmissible merely because the opinion is based on inadmissible hearsay, so long as the opinion is based on trustworthy information and the expert had sufficient experience to evaluate that information so as "to come to a conclusion which the trial court might well hold worthy of consideration by the jury." Id., 466.[9]

---

[9] In *Vigliotti* v. *Campano*, supra, 104 Conn. 465, the plaintiff, in order to prove the prevailing wage for farm services, had introduced, over the defendant's objection, the testimony of two farmers, who testified, largely from statements made to them by others, as to those wages. On appeal, this court stated: "The objection to both witnesses was that they were not competent to answer the questions, largely because the sources of their information, if offered in evidence, would be objectionable as hearsay. The

Second, the policy justification for our holding in *Brown*, namely, that the testimony of a nontreating physician is too unreliable to be included in the exception to the hearsay rule "which allows a physician to testify to his opinion even though it is based, in whole or in part, on statements made to him by a patient for the purpose of obtaining from him professional medical treatment or advice incidental thereto"; *Brown* v. *Blauvelt*, supra, 152 Conn. 274; is without a sound basis. In *Brown*, we reasoned that "the safeguard [that] the patient's desire to recover his health [would] restrain him from giving inaccurate statements to a physician employed to advise or treat him . . . [was] lacking where the physician is employed by the injured party merely to testify on his behalf. . . . This is [nonetheless] true where . . . the physician is employed by, and merely for the purpose of enabling him to testify for, the injured person's adversary." (Citations omitted.) Id., 275. We concluded that "[i]ndeed, there [was] an especial incentive to inaccuracy and exaggeration in statements made to a physician under such circumstances." Id.

These assumptions are not accurate. When physicians examine parties, whether for treatment or litigation, they routinely rely on numerous sources of data, including their own physical examination, tests that they may have administered, available medical records, and the statements that a party has made during the course of the evaluation. In other words, the statements made by a patient to a physician constitute only one type of data in a data collection process that necessarily

mere fact that the opinion given by a witness as to value is derived from sources which would not in themselves be admissible in evidence does not render that opinion inadmissible. . . . Both of the witnesses derived their information from sources fairly trustworthy and both had had sufficient experience to co-ordinate and evaluate that information and so to come to a conclusion which the trial court might well hold worthy of consideration by the jury." (Citations omitted.) Id., 465–66.

includes many types of information. Moreover, this evaluation process is generally no less reliant upon the statements of the patient when the physician is the treating physician in the first instance than when the physician has been engaged merely to evaluate the party so as to offer an expert opinion at trial. In the present case, as George's report indicates, he relied on voluminous medical records, including MRIs, X rays and hospital records, as well as the medical history that the plaintiff gave him, and his own physical examination of her. This is hardly material that provides an insufficiently reliable basis for an expert opinion, and is precisely the same material on which physicians who examine patients for the purposes of treatment rely. To the extent that a party's statements to a nontreating physician may be subject to potential exaggeration, that merely supplies possible grist for the mill of cross-examination. It should not, in and of itself, preclude the evidence categorically.

Third, the prevailing view is inconsistent with the *Brown* rule. Although "[h]istorically, many courts drew a sharp line between statements made to physicians consulted for purposes of treatment and those made to physicians consulted solely with the anticipation that the physician would testify in court on the declarant's behalf . . . these restrictions were abandoned by the drafters of the Federal Rule." 2 C. McCormick, Evidence (4th Ed. 1992) § 278, pp. 249–50. Rule 803 (4)[10] of the Federal Rules of Evidence "makes no distinction between treating and nontreating physicians, even though the latter are frequently consulted solely for the

---

[10] Rule 803 (4) of the Federal Rules of Evidence provides in relevant part: "The following are not excluded from the hearsay rule, even though the declarant is available as a witness . . . Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

purpose of preparation for trial. A fact reliable enough to serve as the basis for a diagnosis is also reliable enough to escape hearsay proscription. To be admissible, a statement made for purposes of medical diagnosis must be one that an expert in the field would be justified in relying upon in rendering an opinion." 5 J. Weinstein & M. Berger, Federal Evidence (2d Ed. 1998) § 803.09 [4], p. 803-44. "The general reliance upon 'subjective' facts by the medical profession and the ability of its members to evaluate the accuracy of statements made to them is considered sufficient protection against contrived symptoms. . . . Under prior practice, contrived evidence was avoided at too great a cost and in substantial departure from the realities of medical practice. Rule 803 (4) eliminates any differences in the admissibility of statements made to testifying, as contrasted with treating, physicians."[11] 2 C. McCormick, supra, § 278, pp. 250–51. We consider this modern approach to the admission of a physician's testimony to be sensible, and we therefore adopt it.

Our conclusion is consistent with rule 703 of the Federal Rules of Evidence; see footnote 11 of this opinion; as well as our holding in *In re Barbara J.*, 215 Conn. 31, 42–43, 574 A.2d 203 (1990), in which we relied,

---

[11] Professor McCormick notes that "[the] rigid limitations on reliance upon subjective symptoms have generally been abandoned as the concepts underlying Federal Rules 703 and 705 have been accepted." 2 C. McCormick, supra, § 278, pp. 249–50, n.2.

Rule 703 of the Federal Rules of Evidence provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Rule 705 of the Federal Rules of Evidence provides: "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

in part, upon that rule. We stated: "The fact that an expert opinion is drawn from sources not in themselves admissible does not render the opinion inadmissible, provided the sources are fairly reliable and the witness has sufficient experience to evaluate the information. *Vigliotti* v. *Campano*, [supra, 104 Conn. 464]; *Schaefer, Jr. & Co.* v. *Ely*, 84 Conn. 501, 508, 80 A. 775 (1911). An expert may base his opinion on facts or data not in evidence, provided they are of a type reasonably relied on by experts in the particular field. *State* v. *Cuvelier*, 175 Conn. 100, 107–108, 394 A.2d 185 (1978); see Fed. R. Evid. 703. This is so because of the sanction given by the witness's experience and expertise. *Burns* v. *Metropolitan Lumber Co.*, 94 Conn. 5, 6, 107 A. 609 (1919). C. Tait & J. LaPlante, Connecticut Evidence (2d Ed.) § 7.16.8 (c)." (Internal quotation marks omitted.) *In re Barbara J.*, supra, 42–43.

Moreover, this conclusion is consistent with the way that we treat the testimony of psychiatrists in the context of criminal trials. We routinely admit the opinion of psychiatrists who have examined criminal defendants, not for treatment, but for the sole purpose of testifying to the defendants' mental condition. Moreover, we admit that testimony regardless of whether the psychiatrist was selected by the defendant or the state. We can think of no logical reason why we would consider this testimony sufficiently reliable to be presented to a jury in a criminal trial, but continue to conclude that the testimony of a nontreating physician is not reliable enough to be presented to a jury in a civil trial.

B

We next decide whether our holding should be applied solely on a prospective basis. The defendant claims that, if we were to decide that *Brown* should be

overruled, "clearly [we] should do so only in a prospective manner because [we] will be overruling a decision which has been in effect for over [forty] years. The defendant in this case relied on stare decisis and the predictability of our judicial system in setting up its strategy for this case. . . . [A]pplying a new rule of law retrospectively will produce a substantially inequitable result." We disagree.

When this court renders a decision, the general rule is that the decision will apply to the parties involved in the case in which the decision was reached. This presumption of the applicability of our decision to the parties before us applies equally when the decision reached involves our conclusion that a prior holding by this court should be overruled. Otherwise, the party who undertook the effort of persuading this court to overrule a properly invalidated decision would be deprived of the fruits of his or her effort. As a matter of policy, therefore, the nonretroactive application of our decisions would act as a disincentive to parties to attempt to persuade this court to advance the law.

Moreover, although "[i]t has often been held or recognized that where particular persons have acted in justifiable reliance on a subsequently overruled judicial decision and retroactive application of the overruling decision would defeat their reliance interests . . . the overruling decision should be denied retroactive application in order to prevent such persons from being subjected to unfairness or undue hardship"; 10 A.L.R.3d 1371, 1386 § 5 [b]; we view this principle as generally applying to a *party's* conduct, not to an attorney's strategy. Further, given that "[t]he basic purpose of a trial is the determination of truth"; (internal quotation marks omitted) *Brown* v. *Louisiana*, 447 U.S. 323, 334, 100 S. Ct. 2214, 65 L. Ed. 2d 159 (1980); *Tehan* v. *United States ex rel. Shott*, 382 U.S. 406, 416, 86 S. Ct. 459, 15 L. Ed. 2d 453 (1966); the defendant's claim that "[f]or obvious

reasons, if the defendant believed *Brown* was no longer good law, it would not have had [an examination] performed and instead would have relied on the disparity between the ratings given by the plaintiff's two treating physicians," is unavailing. Finally, we think that it would be purely speculative to conclude that, given the fact that the extent of the plaintiff's injuries was hotly contested, the defendant exercised his discovery right to have the plaintiff examined solely because of the then extant *Brown* rule.[12]

## II

### A

Having decided that *Brown* should be overruled and that our holding should not be applied on a prospective basis only, we must now decide whether the plaintiff is entitled to a new trial. "We have often stated that before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful." *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990). "The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *Pagano* v. *Ippoliti*, 245 Conn. 640, 652, 716 A.2d 848 (1998). Because we

[12] Although not mentioned by the defendant, we note that we view our holding in *State* v. *Troupe*, supra, 237 Conn. 305–306, that the modification of the constancy of accusation doctrine we announced in that decision would be applied on a prospective basis, as distinguishable from the issue presently before us. In *Troupe*, we exercised our discretion not to apply our holding retroactively based on our express concern for the "unreasonable burdens on the state and on victims whose constancy of accusation testimony was admitted in justified reliance on our prior consistently applied law." Id., 305 n.21. Moreover, we noted that "[o]ur decision to give only prospective effect to the modification of the doctrine [was] buttressed by the fact that the issue [had been] raised, sua sponte, by the court and not raised by the parties . . . ." Id., 306 n.22. In the present case, in which the plaintiff raised the issue at trial, the policy reason of encouraging this type of legal pioneering, as discussed in the text of this opinion, counsels in favor of applying our holding retroactively.

conclude that the exclusion of the testimony of George likely affected the jury's verdict in the present case, we remand this case for a new trial.

As discussed previously, the plaintiff was seeking damages for injuries to her cervical spine and right knee. During the course of the trial, it became apparent that, although the plaintiff continued to deny having any recollection that she had ever injured her cervical spine, she had, in fact, previously suffered such an injury in a March, 1992 automobile accident. We assume, without deciding, therefore, that the plaintiff's credibility was either sufficiently impeached with regard to the injury to her cervical spine that any claim of permanent injury was dismissed by the jury, or, to the extent that the jury believed that she had incurred permanent damage to her cervical spine, the jury found that this damage was due solely to the prior accident.[13]

Thus, the determinative question is whether, had the jury been presented with the testimony of George, it likely would have returned a different verdict with regard to the award of noneconomic damages for the permanent injury to the plaintiff's right knee. Viewing the jury's award of no noneconomic damages as an indication that it considered the evidence offered by the plaintiff as not worthy of belief, we conclude that George's testimony likely would have affected the jury's award of noneconomic damages.

As discussed previously, during the trial, the plaintiff offered into evidence the testimony of two orthopedic

---

[13] We presume that the jury would have followed the trial court's instructions absent a clear indication to the contrary. See State v. Schiappa, 248 Conn. 132, 167, 728 A.2d 466 (1999). With regard to the prior accident, the court instructed the jury that "there has been some evidence in this case that the plaintiff suffered an injury to her neck from another accident. If you find that there has been a preexisting condition to her neck you are cautioned that you may not make any award for any pain and suffering resulting from such preexisting injury resulting from an accident which occurred before the accident in question."

surgeons, Belkin and Shanley. With regard to the permanent disability resulting from the accident, Belkin and Shanley rated the disability to the plaintiff's right knee at 5 percent and 20 percent, respectively. In light of this testimony, the jury's award of no noneconomic damages indicates that the jury was persuaded by the defendant's attempt to impeach the credibility of the plaintiff, and that, furthermore, the jury must have discredited entirely the permanency rating given by Shanley.[14]

During the trial, the defendant elicited evidence that the plaintiff had stopped visiting Belkin, in part, because she had been dissatisfied with his permanent disability ratings, and that subsequently, she had sought the services of Shanley, the father of a friend. The defendant's counsel emphasized, in his closing statements to the jury, that Shanley was also the physician who had rated the plaintiff's permanent disability to her knee at 20 percent—the highest rating of all three physicians.[15] In addition, after emphasizing the fact that, during cross-examination, the plaintiff's responses regarding her fitness regime indicated that she may have exaggerated the frequency and duration of her gymnasium workouts prior to the May, 1993 accident, as well as the nature of her workouts following the accident, the defendant argued to the jury that "the most important [issue] in this whole case [was the] credibility of witnesses . . . ."

---

[14] In the present case, the trial court instructed the jury: "[A]s to the permanent aspect of the injuries claimed if you find that it is reasonably probable that the plaintiff has suffered any permanent physical impairment you will try to compensate her for such impairment as you find she sustained in the accident."

[15] In his closing argument, the defendant's counsel stated: "But you know what she told us. She didn't like the disability so she changed doctors. She went to her friend's father. . . . [H]e gave her a 20 percent disability. . . . You'll notice the plaintiff changed doctors. . . . Same treatment. Different doctors, different permanencies. Same treatment. The only thing that changed was the permanency."

The plaintiff's primary challenge, therefore, was to overcome the defendant's attack on her credibility. With regard to the suggestion by the defendant that the plaintiff's present workout schedule indicated that she was not necessarily experiencing present pain, the plaintiff countered that she had continued to engage in a rigorous fitness routine in order to obtain the obvious health benefits associated with exercise, as well as to continue to strengthen her knee. In response to the defendant's suggestion that, having been dissatisfied with the 5 percent permanent disability rating given by Belkin, she had sought out the treatment of the father of a friend, she countered that she had been dissatisfied overall with Belkin's treatment,[16] and that, like most persons, when seeking a new physician, she chose one whom someone that she knew was able to recommend.[17] The jury's verdict is some indication that it was not persuaded by these arguably legitimate responses. We conclude that the testimony of George likely would have convinced them otherwise, thereby resulting in a jury award of at least some noneconomic damages for the permanent disability to the plaintiff's right knee.

First, as noted, although he did not "understand where the 20 percent [rating came] from," George concluded that the plaintiff had suffered a 15 percent permanent disability to her right knee. Importantly, his report indicated that his conclusions were based, in part, on objective criteria. Specifically, with regard to her knee, George stated that the "[e]xamination of the right knee shows subjective response of discomfort

---

[16] When asked on redirect examination by her counsel whether she was unhappy with more than the mere disability rating that Belkin had given her, the plaintiff replied: "Yes, I was. . . . I didn't think he was thorough."

[17] In closing argument, the plaintiff's counsel stated: "[Y]ou may say, well, wait a minute. How did she get to Dr. Shanley? She knew his son she told you. Does that seem unreasonable to you? Was she supposed to ask a lawyer? . . . Who do you trust? Sometimes relatives of people that you know and like. That makes sense."

with patellar motion side-to-side in distal patellofemoral compression. The overall range of patellar mobility compares favorably with the left knee. [The plaintiff] appears to have some lateral joint line tenderness, for which I have no explanation from the database. She has full range of motion of the knee. *There is no obvious atrophy, but during strength testing over the side of the table the left leg appears significantly stronger, assuming she is making full subjective effort to straighten against resistance. There is also palpable and slightly audible crepitation from the patellofemoral joint, which is consistent with the findings of patellofemoral chondromalacia, resulting from direct knee-joint contusion in the accident."* (Emphasis added.) Moreover, commenting on the plaintiff's statements, George stated that "[w]ith regard to her knee complaints, I think they are very real, though obviously it is difficult to rate pain and the subjective issues associated with pain . . . ."

Thus, had George's testimony been admitted, the plaintiff's case would have included the testimony of a physician who: (1) considered the plaintiff's difficulties with her knee to be "very real"; (2) had found, in addition to the subjective complaints by the plaintiff, objective symptoms consistent with her complaints and connected with a permanent disability; (3) although engaged by the defendant, was nevertheless willing to entertain the possibility that Shanley's 20 percent rating could be correct; (4) would, at the least, have calculated the plaintiff's permanent disability to her right knee at 15 percent; and (5) as a result of the subpoena in effect, would have testified in person, as opposed to the medical report evidence produced regarding the opinions of Belkin and Shanley. We therefore conclude that George's testimony likely would have led the jury to conclude that the plaintiff had, in fact, suffered some

degree of compensable permanent injury to her right knee.

## B

The last issue we must decide is whether, as the plaintiff argues, the new trial should be limited to damages only. The defendant claims that, because in this case "the amount of damages and issues of liability were 'inextricably interwoven' . . . the court if it remands this case for a new trial, should not limit said trial only to damages." We agree with the defendant.

"Ordinarily the reversal of a jury verdict requires a new trial of all the issues in the case. Where the error as to one issue . . . is separable from the general issues, the new trial may be limited to the error found, provided that such qualification or limitation does not work injustice to the other issues or the case as a whole. *Murray* v. *Krenz*, 94 Conn. 503, 507, 109 A. 859 (1920). But where the retrial of the single issue may affect the other issues to the prejudice of either party, the court will not exercise its discretion in limiting the new trial but will grant it de novo. . . . Id., 508. We have applied this principle in ordering retrials on both liability and damages when there was reason to believe that a verdict, so low in relation to the injuries sustained in a negligence case that reversal is warranted, may have resulted from a compromise reached by the jurors on the issue of liability. *Fazio* v. *Brown*, 209 Conn. 450, 457, 551 A.2d 1227 (1988); *Malmberg* v. *Lopez*, 208 Conn. 675, 682–83, 546 A.2d 264 (1988); *Johnson* v. *Franklin*, 112 Conn. 228, 232, 152 A. 64 (1930); *Murray* v. *Krenz*, supra, [508–509]." (Internal quotation marks omitted.) *DeLaurentis* v. *New Haven*, 220 Conn. 225, 268, 597 A.2d 807 (1991). "The decision to retain the jury verdict on the issue of liability and order a rehearing to determine only the issue of damages should never be made unless the court can clearly see that this is the way of

doing justice in [a] case." (Internal quotation marks omitted.) *Fazio* v. *Brown,* supra, 455. "As a rule the issues are interwoven, and may not be separated without injustice to one of the parties. *Murray* v. *Krenz,* [supra, 508]; *Sparico* v. *Munzenmaier,* 134 Conn. 194, 197, 56 A.2d 165 (1947); *Niles* v. *Evitts,* [16 Conn. App. 696, 699, 548 A.2d 1352 (1988)]." (Internal quotation marks omitted.) *Fazio* v. *Brown,* supra, 455.

In the present case, the jury's award of no noneconomic damages may have resulted from either: (1) a determination by the jury that the plaintiff had incurred no noneconomic damages as a result of the May, 1993 accident; or (2) "a compromise verdict, that is, a verdict where some of the jurors . . . conceded liability against their judgment, and some . . . reduced their estimate of the damages in order to secure an agreement of liability with their fellow jurors. . . ." (Internal quotation marks omitted.) Id., 457. In light of the fact that "[a]n order restricting the issues [of a new trial] is the exception, not the rule"; (internal quotation marks omitted) id., 455; we are unable "*clearly* [to] see that [a trial limited to damages] is the way of doing justice in [this] case." (Emphasis in original.) Id.

The judgment is reversed and the case is remanded for a new trial.

In this opinion CALLAHAN, C. J., and BERDON, NORCOTT, PALMER and PETERS, Js., concurred.

MCDONALD, J., concurring. The Federal Rules of Evidence are largely followed in over thirty-five states, set forth the rules of evidence in comprehensive and simple terms, have been subject to extensive interpretation by both federal and state courts, and the treatises explaining the rules have received widespread acceptance. As a review of our more recent cases reveals, the Federal Rules of Evidence have had a profound

effect upon Connecticut's law of evidence. See generally, e.g., *State* v. *Schiappa*, 248 Conn. 132, 141–58, 728 A.2d 466 (1999) (rule 804 [a] [3] and [b] [3]); *State* v. *Lewis*, 245 Conn. 779, 802 n.21, 717 A.2d 1140 (1998) (rule 804); *State* v. *Askew*, 245 Conn. 351, 363 n.18, 716 A.2d 36 (1998) (rule 609); *State* v. *Baldwin*, 224 Conn. 347, 355 n.2, 618 A.2d 513 (1993) (rule 404); *State* v. *Hopkins*, 222 Conn. 117, 124, 609 A.2d 236 (1992) (rule 801); *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 221 Conn. 194, 199 n.3, 602 A.2d 1011 (1992) (rule 408); *State* v. *Ireland*, 218 Conn. 447, 456 n.3, 590 A.2d 106 (1991) (rule 401); *In re Barbara J.*, 215 Conn. 31, 43, 574 A.2d 203 (1990) (rule 703); *Hall* v. *Burns*, 213 Conn. 446, 456–57, 569 A.2d 10 (1990) (rule 407); *State* v. *Spigarolo*, 210 Conn. 359, 373, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989) (rule 704). It would benefit our courts and the bar to adopt the Federal Rules of Evidence with a few Connecticut modifications to take advantage of the very many decisions interpreting them, the many fine texts explaining them and the uniformity of courthouse evidence rules.

Because this case represents another small step toward adopting those rules, I concur.