******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ROGERS, C. J., and ROBINSON, J., join, dissenting. On June 18, 2013, a referendum was held in the towns of Woodbury and Bethlehem on the question of whether to finance more than $63 million worth of renovations to the regional high school. The financing was approved by a margin of four votes, 1269 to 1265. The majority upholds this referendum result as valid, even though the town clerks of Woodbury and Bethlehem (town clerks) failed to notify the voters of those towns that the referendum was being held, as prescribed by statute. I conclude to the contrary that the referendum result is invalid because the town clerks completely failed to comply with the statutory notice requirement, as opposed to substantially or even partially complying, and because this was a referendum, as opposed to a general or primary election. Accordingly, I respectfully dissent.

The majority rejects the plaintiffs'[1] claim that the town clerks' failure to comply with the notice statutes; see General Statutes §§ 9-226, 10-47c and 10-56; was prejudicial per se, rendering the referendum null and void ab initio. Instead, the majority concludes that, when a party claims that a referendum result is invalid, violations of the statutes governing referenda are subject to the same standard as violations of statutes governing general elections, namely, that a plaintiff must prove that "(1) there were substantial violations of the requirements of the [governing] statute[s] . . . and (2) as a result of those violations, the reliability of the result of the election is seriously in doubt." *Bortner* v. *Woodbridge*, 250 Conn. 241, 258, 736 A.2d 104 (1999); see also *Caruso* v. *Bridgeport*, 285 Conn. 618, 650–52, 941 A.2d 256 (2008). Applying that standard to the facts of this case, the majority concludes that the trial court properly determined that the violations of the notice statutes did not cause the reliability of the referendum result to be seriously in doubt, given the widespread publicity of the referendum at issue.

Although I question whether the statutory violation in the present case satisfies the *Bortner* standard, I need not address that issue because *Bortner* does not provide the appropriate standard for evaluating the impact of statutory violations on the validity of referenda. The majority fails to recognize that referenda are fundamentally different from primary or general elections, and, therefore, we should require stricter compliance with statutes governing referenda.

It is widely accepted that the degree to which election officials must comply with statutory notice requirements depends on the type of election being held. "Notice requirements may be relaxed for general elections because the public is presumed to know when they

are held, but strict compliance with notice requirements for a special election normally is required although some jurisdictions only require substantial compliance." (Footnotes omitted.) 26 Am. Jur. 2d 79–80, Elections § 277 (2014). Compare, e.g., *Whittle* v. *Whitley*, 202 Ga. 633, 633, 44 S.E.2d 241 (1947) (special election was invalid when notice was published one week in advance instead of two weeks in advance, as statutorily required), *Bilek* v. *Chicago*, 396 Ill. 445, 454, 465, 71 N.E.2d 789 (1947) (special election was invalid when notice was published but failed to include time and place of election in each district), and *Neal* v. *Board of Supervisors*, 217 Miss. 102, 111, 63 So. 2d 540 (1953) (special election was invalid when notice was published twenty-eight days in advance instead of at least thirty days in advance, as statutorily required), with *Fuller* v. *Board of Education*, 875 P.2d 1156, 1159 (Okla. App. 1994) (special election was valid when notice was published but failed to include locations of polling places and information regarding absentee voting), and *Cohen* v. *Clear Lake City Water Authority*, 687 S.W.2d 406, 408–409 (Tex. App. 1985) (special election was valid when notice was published but not all publications included same level of detail regarding question to be voted on).

In Connecticut, we previously have recognized the distinction between special and general elections and have required strict compliance with notice requirements for special elections. In *Pollard* v. *Norwalk*, 108 Conn. 145, 146, 142 A. 807 (1928), the legislature authorized by special act the issuance of bonds in an amount not to exceed $450,000 for the city of Norwalk, subject to the approval of city residents. The city's residents approved the issuance of the bonds "[a]t the city election in October, 1927 . . . ." Id. However, legal notice of the election was given no more than thirteen days in advance, and the city charter required that notice be given at least two weeks in advance. Id. "[I]n view of [this] failure to give notice of the city . . . election in 1927 for the period of time fixed by the charter"; id., 147; the court invalidated the election result, even though legal notice had been given merely one day late. See id. In reaching this conclusion, the court relied on case law in which this court had held that notice statutes for town meetings "must be complied with literally . . . ." Id., 146. Thus, this court has required strict, not merely substantial, compliance with statutory notice requirements for special elections concerning the issuance of municipal bonds.

The trial court in the Litchfield action,[2] and by extension the trial court in the present case, noted that *Pollard* is inapposite because *Pollard* relied on case law relating to notice requirements for town meetings, not referenda.[3] See *Woodbury* v. *Regional School District No. 14*, Superior Court, judicial district of Litchfield, Docket No. LLI-CV-13-6009045-S (December 13, 2013).

The fact that *Pollard* relied on case law involving town meetings, however, in no way makes it less relevant or applicable in the present case.

As an initial matter, *Pollard* involved an *election*, not a town meeting, as evidenced by the court's repeated reference to "the city . . . election to be held in 1927 . . . ." *Pollard* v. *Norwalk*, supra, 108 Conn. 146; see also id., 147 ("the city . . . election in 1927"). Indeed, the court referred three times to the vote on the issuance of the municipal bonds as an election. Id., 146–47. Even if the vote on the municipal bonds *was* taken at a town meeting, *Pollard* nevertheless would be applicable in the present case. Whether the votes in *Pollard* were cast at a communal town meeting or in individual voting booths is irrelevant. What is important is that this court has required strict compliance with statutory notice requirements when local electorates are deciding whether to finance the issuance of municipal bonds.[4]

Thus, *Pollard*, not *Bortner*, controls in the present case. *Pollard* involved a special election, which is an election that is not held regularly. See, e.g., *Walker* v. *Oak Cliff Volunteer Fire Protection District*, 807 P.2d 762, 766 (Okla. 1990) ("special elections are not set on a date certain"). The present case involves a referendum, which is a type of special election because referenda are not held regularly. Compare, e.g., General Statutes § 10-47c (providing that regional board of education of regional school district "shall set the date for referenda" to amend regional school district plan approved through referenda), with Conn. Const., art. III, § 8 (providing that general election for state legislature "shall be held on the Tuesday after the first Monday of November, biennially, in the even-numbered years"). *Pollard* therefore is directly applicable to the present case. In contrast, *Bortner*, as the majority recognizes, involved an election of municipal officers; see *Bortner* v. *Woodbridge*, supra, 250 Conn. 246–47; and *Caruso*, which applied the standard in *Bortner*, involved a primary election. See *Caruso* v. *Bridgeport*, supra, 285 Conn. 622. As previously noted, the difference between general and special elections is crucial for purposes of providing notice because it cannot be presumed that voters know the date of a special election or, in this case, a referendum. Accordingly, *Bortner* is inapplicable, and we instead must follow *Pollard*, which dictates that there must be strict compliance with the statutes governing referenda.

We need not, however, decide whether to apply a standard of strict compliance, as *Pollard* dictates, or mere substantial compliance because, in the present case, there was *no compliance*. The parties stipulated to the fact that the town clerks made no effort to comply with the statutory requirement of publishing notice of the referendum in a newspaper of general circulation. Thus, there is no question that the town clerks' actions

failed to satisfy either standard.[5]

The question then becomes what is the effect, if any, of the evidence that the voters of the towns of Woodbury and Bethlehem had actual notice of the referendum? As the majority observes, there were multiple newspaper articles regarding the referendum, and the named defendant Regional School District Number 14, attempted to publicize the referendum. Can such alternative forms of publicity cure the failure to provide legal notice? Given that we never before have been presented with this exact question, sister state case law is instructive.

In cases in which election officials have partially or substantially complied with applicable statutory notice requirements for a special election, some jurisdictions have held that actual notice can cure the failure to comply strictly with such requirements. See, e.g., *Demaree* v. *Johnson*, 150 Ind. 419, 424–26, 50 N.E. 376 (1898) (special election was valid when someone other than sheriff posted ten statutorily required copies of notice of special election because electorate had actual knowledge thereof); *Wright* v. *Flynn*, 55 Mont. 61, 61–62, 173 P. 421 (1918) (special election was valid when county clerk posted notice in three most public places but failed to publish notice in newspaper, as required by statute, because voters had actual knowledge of election); *Ginn* v. *Bonita*, 62 So. 2d 159, 162 (La. App. 1952) (special election was valid when legal notice was posted in public places but not in newspaper, as required by statute, because almost every eligible voter voted); *State ex rel. Board of Education* v. *Jones*, 58 Ohio Op. 227, 230, 131 N.E.2d 704 (C.P. 1955) (publication of notice for two consecutive weeks in advance of special election, instead of four, was cured by, inter alia, "the distribution of literature; letters and cards mailed to the householders of the city; the house-to-house canvass by the Citizens Committee; [and] the posting of notices in various public places"); *Wilson-Patton Post 536, Inc., License*, 62 Pa. D. & C. 215, 218, 229–30 (1948) (special election was valid when legal notice was provided but failed to include location where election was being held because voters had actual notice of election); *Yonce* v. *Lybrand*, 254 S.C. 14, 15–18, 173 S.E.2d 148 (1970) (publication of notice less than fifteen days prior to referendum, as required by statute, was cured by newspaper articles and political advertisements regarding referendum); *State ex rel. Inman* v. *Quarterly County Court*, 209 Tenn. 153, 155, 351 S.W.2d 390 (1961) (posting of legal notice eight days in advance of referendum instead of ten days, as statutorily required, was not fatal because "[the] election was given widespread newspaper publicity and . . . every interested citizen had an opportunity to vote and a great majority of them did"); *Norman* v. *Thompson*, 96 Tex. 250, 251–52, 254, 72 S.W. 62 (1903) (special election was valid, even though notice was posted in only four

of five statutorily required locations, because voters had actual notice of election); *Rands* v. *Clarke County*, 79 Wn. 152, 159–60, 139 P. 1090 (1914) (publication of notice twenty-six days in advance of special election instead of twenty-eight days, as required by statute, was cured by fact that "the matter [to be voted on] was generally and publicly discussed by the residents and voters of the county" prior to special election).

However, in cases in which there has been a *complete failure* to comply with a statutory notice requirement, such as in the present case, the majority of jurisdictions have held that evidence of actual notice does not cure the failure to comply. See, e.g., *Chanute* v. *Davis*, 85 Kan. 188, 189–91, 116 P. 367 (1911) (special election on municipal bonds was deemed invalid due to complete failure to provide notice, even though issuance of bonds was matter of "great public interest and agitation" and special election was covered in "[m]any" local newspaper articles); *Chumley* v. *Williams*, 639 S.W.2d 557, 559–60 (Ky. App. 1982) (rejecting claim that "extensive publicity" surrounding special election could cure "total failure" to comply with statutory notice requirement); *Walker* v. *Oak Cliff Volunteer Fire Protection District*, supra, 807 P.2d 766 (invalidating special election results because "there was absolutely no compliance with the statutorily required notice," despite publication of newspaper article and advertisements regarding special election, and house-to-house distribution of handbills [emphasis omitted]); *In re Frederick H. Harper, Jr., Inc.*, 150 Pa. Super. 569, 575, 29 A.2d 236 (1942) ("[T]he lack of [statutorily required] newspaper advertisement by the county board of elections of the holding of the referenda at least ten days in advance thereof was not cured by any degree of actual notice or publicity or public controversy. The entire failure to give the statutory notice rendered the special election invalid."); *Turner* v. *Lewie*, 201 S.W.2d 86, 89 (Tex. Civ. App. 1947, writ dismissed) ("an entire failure to give a notice required by law" was not cured even though "some or even all of the voters learned of the election through reading news items, or by conversations with other citizens, or by hearing of it through any [alternative] means").[6] But see *Wurst* v. *Lowery*, 286 Ark. 474, 475, 695 S.W.2d 378 (1985) ("the failure to publish notice of an election is immaterial if the election is actually held and the electors have not been deprived of the opportunity to express themselves"); *Dishon* v. *Smith*, 10 Iowa 212, 218–19 (1859) (election was valid without notice because "there was an election and the people of the county voted, and it is not alleged that any portion of them failed in knowledge of the pendency of the question, or to exercise their franchise"); *Hanover* v. *Boyd*, 173 Tenn. 426, 438, 121 S.W.2d 120 (1938) (failure to issue and publish writ of election one month prior to special election was cured by virtue of fact that special election was "a matter of public knowledge").

Moreover, at least one state has held that, even when there has been substantial compliance with applicable statutory notice requirements, evidence of actual notice cannot cure the failure to comply strictly with such requirements. See *State ex rel. Berkeley* v. *Holmes*, 358 Mo. 1237, 1239–40, 1242–44, 219 S.W.2d 650 (1949) (publication of notice nineteen days in advance of special election instead of twenty-one days, as required by statute, invalidated election, despite publication of newspaper article concerning special election and mailing of "election maps" to every voter).

Thus, the majority of courts have concluded that evidence of actual notice is insufficient to cure a total failure to comply with statutory notice requirements for special elections. These courts have reasoned that to hold otherwise would effectively erase notice requirements from the statutes and thereby usurp the role of the legislature. The Supreme Court of Kansas summarized this logic best by stating: "The question . . . is whether the court shall recognize a kind of publicity which has no legislative basis whatever upon which to rest in order to support a special election resulting in bonding the city, and thereby adding to the burdens of every taxpayer within its limits. The legislature could not have been unmindful of the fact that proposed measures of this character would be discussed in private, in public, and by the press. Undoubtedly it took for granted the certainty of such publicity. Nevertheless, it provided for a specific notice making a collective statement of all the information necessary for the guidance of a voter, to be published for a definite period of time. The court is not prepared to substitute its judgment for that of the legislature and accept anticipated notoriety as the equivalent of official notice." *Chanute* v. *Davis*, supra, 85 Kan. 190; see also *Chumley* v. *Williams*, supra, 639 S.W.2d 560 ("To hold an election valid when there has been a total failure to comply with a specific requirement of the [legislature] as to notice is simply to hold for naught a specific direction of the legislative authority. . . . Such a holding would result in the abrogation of the power of the [legislature].");
*State ex rel. Berkeley* v. *Holmes*, supra, 358 Mo. 1243 ("it would be a matter of speculation and conjecture . . . to attempt to determine that some other notice or source of information was a proper or effective substitute for the very specific time of notice requirements of the statute"); cf. *American Legion Phillips Post* v. *Malden*, 330 S.W.2d 189, 192 (Mo. App. 1959) ("[T]he only substantial compliance is *actual* compliance in full. A holding that a lesser notice will do would amount to judicial legislation on our part." [Emphasis in original; footnote omitted.]).

This rationale applies with no less force in Connecticut. In enacting §§ 9-226 and 10-47c, the legislature required that, prior to a referendum, "[t]he town clerk

in each town *shall*, in the warning for [a town] election, give notice of the time and the location of the polling place in the town . . . by publishing a warning in a newspaper published within the limits of such city or borough, or having a general circulation therein, not more than fifteen nor less than five days previous to holding the election . . . ." (Emphasis added.) General Statutes § 9-226. In upholding the referendum result in the present case, the majority rewrites this statute to make it directory instead of mandatory, despite the town clerks' total failure to comply with this statutory requirement. It is axiomatic that we do not possess the constitutional authority to replace the legislature's judgment regarding what type of notice voters are entitled to receive with our own.

Additionally, allowing referenda to be held when no legal notice has been given violates fundamental democratic principles. We previously have recognized that, "under our democratic form of government, an election is the paradigm of the democratic process designed to ascertain and implement the will of the people. . . . The purpose of the election statutes is to ensure the true and most accurate count possible of the votes for the candidates in the election [or, as in the present case, for a particular referendum result]. . . . Those statutes rest on the bedrock principle that the purpose of the voting process is to ascertain the intent of the voters." (Citations omitted; internal quotation marks omitted.) *Bortner* v. *Woodbridge*, supra, 250 Conn. 254. Providing legal notice of a referendum is essential to ensuring that the result reflects the true intent of the voters. By allowing town clerks to hold referenda without providing *any* notice to eligible voters, the majority risks depriving voters of their right to govern themselves.[7]

The majority fails to appreciate the significant distinction between a town clerk's complete failure to comply with the statutory notice requirement and instances in which there has been partial or substantial compliance. For instance, the majority cites a litany of sister state cases in support of its assertion that the failure to comply strictly with statutory notice requirements does not invalidate a referendum if there is no evidence that the failure to so comply affected the result. See footnote 19 of the majority opinion. In all but two cases cited by the majority, however, there was at least partial, if not substantial, compliance with the applicable statutory notice requirements. In contrast, in the present case, there was no compliance with the notice statutes.

In sum, the majority incorrectly overrules *Pollard* for no good reason;[8] see footnote 24 of the majority opinion; and applies the standard in *Bortner* for general and primary elections, instead of the standard set forth in *Pollard*, which specifically pertains to special elections on the issuance of municipal bonds.[9] In overruling *Pol-*

*lard* under the facts of this case, the majority in effect amends the notice statutes, a power this court does not have. We thus should follow *Pollard* and render judgment for the plaintiffs because the town clerks failed to comply strictly with the applicable statutory notice requirements. We need not decide whether to reaffirm *Pollard* entirely because there is no question that the town clerks did not strictly or substantially comply but *completely* failed to comply with the statutory notice requirements. The plaintiffs are therefore entitled to prevail regardless of whether strict or substantial compliance is required for referenda.

Accordingly, I respectfully dissent.

[1] The plaintiffs are Thomas Arras, Sean Murphy and Gary Suslavich, who are residents of Woodbury, and Karen S. Miller and Peter T. Miller, who are residents of Bethlehem.

[2] As the majority notes, "[the] uncertainty regarding the validity of the referendum [result at issue in the present case] spawned two separate actions. Specifically, the towns of Bethlehem and Woodbury brought an action against the [named defendant, Regional School District Number 14] in the Superior Court for the judicial district of Litchfield (Litchfield action) seeking, inter alia, a declaratory judgment as to whether the [referendum result was] valid. . . . In addition to the Litchfield action, the plaintiffs filed the present action . . . ." Text accompanying footnote 11 of the majority opinion.

[3] The majority rejects the plaintiffs' claim that case law pertaining to town meetings is applicable in the present case. The majority reasons that such authority is inapplicable because, in *Sadlowski* v. *Manchester*, 206 Conn. 579, 590, 538 A.2d 1052 (1988), this court determined that "a town meeting and a referendum are entirely distinct decision-making mechanisms." It is important to clarify that *Sadlowski* in no way precludes us from considering *Pollard* in the present case for three reasons.

First, as I discuss further, *Pollard* involved an election, not a town meeting. See *Pollard* v. *Norwalk*, supra, 108 Conn. 146. Thus, any holding in *Sadlowski* relating to town meetings is simply irrelevant to *Pollard* and the present case. Second, a cursory examination of *Sadlowski* reveals that the case is inapposite to the present case. In *Sadlowski*, the court considered whether a referendum constituted a legislative body, as defined by General Statutes § 7-193 (a) (1), in order to determine whether the defendant town had the authority to issue tax increment bonds without the approval of town residents through a referendum. See *Sadlowski* v. *Manchester*, supra, 206 Conn. 583, 589. Thus, *Sadlowski* had nothing to do with notice requirements for referenda and has no bearing on *Pollard* or the present case. Third and finally, the distinction the court made in *Sadlowski* between referenda and town meetings does not render case law relating to town meetings irrelevant in the present case. In *Sadlowski*, the court distinguished referenda from town meetings on the basis that a "meeting" is commonly defined as "an assembly or a gathering for political, social, religious or economic purposes"; id., 590; and, therefore, does not necessarily involve casting votes, which a referendum does. See id. This conclusion is undoubtedly correct; a town meeting is not necessarily equivalent to a referendum. However, that does not mean that the two mechanisms are not similar and that case law relating to one cannot be relevant to the other. For instance, a case involving votes being cast at a town meeting; see *Brooklyn Trust Co.* v. *Hebron*, 51 Conn. 22, 24–25 (1883); may be analogous to a referendum for purposes of interpreting notice requirements. Thus, *Sadlowski* is inapplicable in the present case and in no way precludes us from considering *Pollard*.

[4] Finally, any question as to *Pollard*'s applicability in the present case should be dispelled by the court's characterization of *Pollard* in *State ex rel. Berkeley* v. *Holmes*, 358 Mo. 1237, 1241, 219 S.W.2d 650 (1949). In that case, the Supreme Court of Missouri considered the same issue as in *Pollard* and the present case, namely, "whether [a] special election authorizing the bonds [for a certain municipality] was invalid because of insufficient publication of notice." Id., 1239. In its analysis, the court cited Connecticut as a jurisdiction in which "it is held that a strict compliance with the statutory requirements as to the time of giving notice of an election is an essential requirement of its validity." (Internal quotation marks omitted.) Id., 1240–41.

The court further stated that, in *Pollard*, "the [Connecticut] Supreme Court of [Errors] held invalid bonds authorized *at an election* of which only [thirteen] days' notice was given when the law required at least two weeks." (Emphasis added; internal quotation marks omitted.) Id., 1241. Thus, the Supreme Court of Missouri understood *Pollard* as establishing a standard of strict compliance with notice requirements for special elections.

[5] The trial court in the present case, as well as the trial court in the Litchfield action, reached the opposite conclusion, determining that the plaintiffs had failed to show "that there were substantial violations of the requirements of the [notice] statutes . . . ." It is unclear how these courts could reach such a conclusion. Section 9-226, which sets forth the notice requirement for referenda, provides that "[t]*he town clerk* in each town shall . . . give notice of the time and the location of the polling place in the town" by "publishing a warning in a newspaper published in such town or having a general circulation therein . . . ." (Emphasis added.) It is undisputed that, in the present case, the town clerks failed to take any action to publish notice of the referendum. Accordingly, they completely failed to comply with the statutory notice requirement.

Therefore, it appears that the trial court confused the alternative forms of publicity the referendum received with legal notice. As I discuss further, unofficial forms of publicity cannot satisfy the statutory notice requirement. Section 9-226 requires "[t]he town clerk," not a media outlet or other party, to publish notice of a referendum. Alternative forms of publicity therefore do not constitute legal notice of the referendum. Thus, the trial court incorrectly determined that the notice statutes were not violated.

[6] The majority's suggestion that some of these cases are unpersuasive because they "predate the advent of television, not to mention robocalling, mass public signage, mass mailings, the Internet and e-mail" is unfounded in light of more recent decisions by the same courts relying on those cases as precedent. See *Genesis Health Club, Inc.* v. *Wichita*, 285 Kan. 1021, 1034, 181 P.3d 549 (2008) (relying on *Chanute* for proposition that, "[a]s a general rule, unless the statutory notice be given, a special city election authorizing a bond issue is invalid" [internal quotation marks omitted]); *Reese* v. *County Board of Elections*, 10 Pa. Commw. 448, 453–54, 308 A.2d 154 (1973) (relying on *In re Frederick H. Harper, Jr., Inc.*, for proposition that "[r]eferendum questions authorized to be presented to the electorate under a particular statute have been held to constitute a special election within the meaning of . . . the Pennsylvania Election Code . . . rendering the giving of proper notice thereof a fundamental preliminary requisite, without which the election is invalid regardless of the publicity surrounding it" [citation omitted]); *Chumney* v. *Craig*, 805 S.W.2d 864, 869 (Tex. App. 1991, writ denied) (relying on *Turner* in voiding election results because "substantial compliance with a publication requirement did not exist [when] no notice was published").

[7] The majority reasons that a referendum, like a general election of public officials, is a snapshot in time, and, therefore, the invalidation of a referendum result on the ground that there has been no officially prescribed notice would "disenfranchise the voters who contributed to that snapshot by campaigning and voting for a particular result." The majority fails to consider, however, that voters who rely on the officially prescribed notice of a referendum are equally disenfranchised when they fail to vote due to lack of such notice and that all voters are free to participate in a second referendum conducted pursuant to proper statutory notification on the same issue. With respect to the majority's suggestion that enforcing a statutory notice provision would unjustifiably deprive government officials of the power to conduct a special election, the majority overlooks the important distinction between a general and a special election that requires their different treatment.

[8] As we stated in *George* v. *Ericson*, 250 Conn. 312, 736 A.2d 889 (1999), "[t]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Citations omitted; internal quotation marks omitted.) Id., 318. This principle is especially true in the present case because neither party has asked the court to reconsider and overrule *Pollard*, the only case of which I am aware that is directly on point.

[9] The majority overrules *Pollard* on the ground that the court did not engage in any substantive analysis of public policy concerns in that case and that *Pollard* is inconsistent with *Bortner* and *Sadlowski*. See footnote 24 of the majority opinion. *Pollard*, however, is not inconsistent with *Sadlowski* for the reasons discussed in footnote 3 of this opinion. With respect to the other grounds on which the majority relies, *Pollard* discussed the historic roots of strict compliance with legal notice requirements, is the *only* case in which this court has addressed the issue of notice in the context of special elections for the issuance of municipal bonds, and, notably, has never been challenged. See, e.g., *Armstrong* v. *Hartford*, 138 Conn. 545, 551, 86 A.2d 489 (1952) (distinguishing invalidation of special election results in *Pollard* for lack of notice from validation of special election subject to "irregularities in the conduct of an election on the part of election officials unless it appears that the outcome of the election would have been different if they had not occurred"); see also *State ex rel. Perry* v. *Raacke*, 19 Conn. Supp. 248, 250, 111 A.2d 37 (1953) (distinguishing invalidation of election for lack of notice in *Pollard* from validation of election despite irregularities in its conduct). Moreover, we repeatedly emphasized in *Bortner*, which involved voting machine irregularities in a general election, that the standard articulated in that case was applicable pursuant to General Statutes § 9-328, and made no reference to its applicability in any other context. See *Bortner* v. *Woodbridge*, supra, 250 Conn. 244–45 ("[t]he principal issue in this appeal involves the standard to be applied under . . . § 9-328 for a trial court to order a new election" [footnote omitted]). Thus, we reached our decision in *Bortner* only after an exhaustive examination of the language, genealogy and legislative history of that statute. Id., 259–63. To the extent the majority relies on the standard in *Bortner* because certain general language in § 9-328 is similar to general language in the statutory scheme governing referenda, it disregards the fact that referenda are discussed in another chapter of title 9 of the General Statutes and that, because referenda are special elections that are not held regularly, they involve considerations not necessarily relevant in the context of general elections. Accordingly, the majority's decision to overrule *Pollard* on the basis of the reasoning in *Bortner*, a case involving a different type of election and election irregularities, is legally unsupportable.