VITA CARLSON, EXECUTRIX (ESTATE OF GARY CARLSON), ET AL. *v.* WATERBURY HOSPITAL ET AL.
(SC 17476)
(SC 17477)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued December 1, 2005—officially released September 26, 2006

*Frank H. Santoro*, with whom were *Kevin M. Tepas* and, on the brief, *Calum B. Anderson*, for the appellants (defendant Stamford Medical Group, P.C., et al.).

*Joshua D. Koskoff*, with whom was *Antonio Ponvert III*, for the appellee (plaintiff).

*Cesar A. Noble* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Jeffrey R. Babbin* filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*David N. Rosen* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

PALMER, J. This appeal[1] arises out of a medical malpractice action brought by the plaintiff, Vita Carlson, individually and as executrix of the estate of her deceased husband, Gary Carlson (decedent), against Waterbury Hospital, Stamford Medical Group, P.C., and O. Joseph Bizzozero and Robert Goldsmith, both of whom are physicians,[2] seeking damages for the death of the decedent following his elective hip replacement surgery. After Waterbury Hospital and Bizzozero settled with the plaintiff, and the plaintiff withdrew her claims against them, a jury returned a verdict for the plaintiff against the remaining defendants, namely, Goldsmith and Stamford Medical Group, P.C.,[3] for ten million dollars. The trial court rendered judgment in accordance with the verdict, also awarding the plaintiff "offer of judgment" interest of nearly six million dollars, for a judgment totaling approximately sixteen million dollars. On appeal,[4] the defendants contend that the trial court improperly precluded them from asserting an apportionment claim pursuant to General Statutes § 52-572h.[5] We

[1] We note that the defendants Robert Goldsmith and Stamford Medical Group, P.C., filed an appeal and an amended appeal in the present case. In the interest of simplicity, we refer to these appeals as one appeal.

[2] At all times relevant to this appeal, Goldsmith was a member of and employed by Stamford Medical Group, P.C.

[3] We hereinafter refer to Goldsmith and Stamford Medical Group, P.C., collectively as the defendants.

[4] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] General Statutes § 52-572h provides in relevant part: "(c) In a negligence action to recover damages resulting from personal injury, wrongful death

## agree with the defendants and, accordingly, reverse the judgment of the trial court.[6]

or damage to property occurring on or after October 1, 1987, if the damages are determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for such party's proportionate share of the recoverable economic damages and the recoverable noneconomic damages except as provided in subsection (g) of this section.

"(d) The proportionate share of damages for which each party is liable is calculated by multiplying the recoverable economic damages and the recoverable noneconomic damages by a fraction in which the numerator is the party's percentage of negligence, which percentage shall be determined pursuant to subsection (f) of this section, and the denominator is the total of the percentages of negligence, which percentages shall be determined pursuant to subsection (f) of this section, to be attributable to all parties whose negligent actions were a proximate cause of the injury, death or damage to property including settled or released persons under subsection (n) of this section. Any percentage of negligence attributable to the claimant shall not be included in the denominator of the fraction.

"(e) In any action to which this section is applicable, the instructions to the jury given by the court shall include an explanation of the effect on awards and liabilities of the percentage of negligence found by the jury to be attributable to each party.

"(f) The jury or, if there is no jury, the court shall specify: (1) The amount of economic damages; (2) the amount of noneconomic damages; (3) any findings of fact necessary for the court to specify recoverable economic damages and recoverable noneconomic damages; (4) the percentage of negligence that proximately caused the injury, death or damage to property in relation to one hundred per cent, that is attributable to each party whose negligent actions were a proximate cause of the injury, death or damage to property including settled or released persons under subsection (n) of this section; and (5) the percentage of such negligence attributable to the claimant.

\* \* \*

"(n) A release, settlement or similar agreement entered into by a claimant and a person discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the total award of damages is reduced by the amount of the released person's percentage of negligence determined in accordance with subsection (f) of this section. . . ."

Although Public Acts 1999, No. 99-69, § 1, made a technical change to subsection (c) of § 52-572h, that change has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 52-572h throughout this opinion.

[6] The defendants also claim on appeal that the trial court improperly denied their motion for remittitur and improperly awarded offer of judgment interest. We do not address these claims in light of our conclusion that the defendants are entitled to a new trial.

The jury reasonably could have found the following facts. On December 10, 1993, the decedent, then a forty-nine year old male, visited Goldsmith, his physician, complaining of recurrent burning chest pain. Goldsmith examined the defendant and administered an electrocardiogram (EKG). Goldsmith concluded that the decedent's symptoms were gastric in nature, prescribed a gastric medication and told the decedent to call him if his symptoms persisted. The decedent did not contact Goldsmith thereafter.

Approximately six weeks later, on February 1, 1994, the decedent underwent elective hip replacement surgery at Waterbury Hospital. Bizzozero, an internist at the hospital, examined the decedent prior to surgery and cleared him for the procedure. Bizzozero also monitored the decedent's condition throughout his stay at the hospital and provided him with postoperative care. Two days after the surgery was performed, the decedent, who was severely anemic, suffered a fatal cardiac arrest caused at least in part by the stress of the surgery on his preexisting but undiagnosed coronary artery disease.

The record reveals the following additional facts and procedural history. On March 2, 1995, the plaintiff commenced the present action against Goldsmith and Bizzozero, among others, alleging that their negligent care and supervision of the decedent had resulted in his untimely death. With respect to Goldsmith and Bizzozero, the plaintiff alleged, inter alia, that each of them negligently had: (1) failed to care for, treat, monitor and supervise the decedent; (2) failed to diagnose and treat his coronary artery disease and myocardial ischemia;[7] (3) dismissed his abnormal EKG readings;

---

[7] Myocardial ischemia is a deficiency of blood supply to the heart resulting from the obstruction or constriction of the coronary arteries. See Stedman's Medical Dictionary (28th Ed. 2006) p. 1001.

(4) failed to consult with or to refer the decedent to a cardiologist; and (5) permitted him to undergo elective orthopedic surgery under general anesthesia.[8] With respect to Bizzozero, the plaintiff also alleged that he negligently had: (1) prescribed and administered antacid medication; (2) failed to obtain information from the decedent's "primary physician" regarding his cardiac history and previous EKG results; and (3) cleared the decedent for elective surgery. The plaintiff brought these claims in her representative capacity as executrix of the decedent's estate and in her individual capacity for loss of consortium.

During the course of the pretrial proceedings, the plaintiff disclosed several experts, including H. Brandish Marsh, Eric J. Vanderbush and Stephen R. Payne, all of whom are physicians. With respect to Marsh, the plaintiff's disclosure stated generally that Marsh would testify, inter alia, that Goldsmith and Bizzozero each had deviated from the applicable standard of care in their treatment of the decedent in one or more of the ways set forth in the plaintiff's complaint.[9] With respect to Vanderbush and Payne, the plaintiff's disclosures identified with specificity the various ways in which each believed that Bizzozero had deviated from the applicable standard of care in his treatment of the decedent.[10]

---

[8] The plaintiff raised essentially the same claims against Stamford Medical Group, P.C., under the doctrine of respondeat superior.

[9] The plaintiff filed her expert disclosure of Marsh on or about June 24, 1997.

[10] The plaintiff first disclosed Vanderbush as an expert on or about February 25, 1997. That disclosure stated generally that Vanderbush would testify, inter alia, that Goldsmith and Bizzozero had deviated from the standard of care in their treatment of the decedent in one or more of the ways alleged in the plaintiff's complaint. The plaintiff thereafter filed a second disclosure pertaining to Vanderbush, dated August 18, 1999, which set forth with specificity the various ways in which Vanderbush believed that Bizzozero had deviated from the standard of care in his treatment of the decedent. The plaintiff's disclosure of Payne, dated February 6, 2003, also specified the testimony that Payne would provide regarding the various ways in which

In the early summer of 2003, as the case approached trial, counsel for the defendants discovered that the plaintiff had settled her claims against Bizzozero and Waterbury Hospital.[11] Soon thereafter, on July 15, 2003, the defendants filed a notice of intent to assert a claim for apportionment of liability against Bizzozero.[12] Subsequently, the defendants disclosed five expert witnesses, including Goldsmith, in support of their apportionment claim against Bizzozero. Three of those experts were Vanderbush, Marsh and Payne, each of whom previously had been disclosed by the plaintiff as an expert. With respect to Vanderbush, the disclosure notice, which was dated July 24, 2003, specified the various ways in which Vanderbush believed that Bizzozero had deviated from the standard of care in his treatment of the decedent. The disclosure notices for Marsh and Payne, which were dated July 24, 2003, and September 5, 2003, respectively, stated generally that Marsh and Payne would testify that Bizzozero had deviated from the standard of care in one or more of the ways set forth in the plaintiff's complaint and as described in their depositions. The defendants' final expert disclosure notice, dated October 3, 2003, identified a fifth physician, Paul D. Iannini. According to that disclosure notice, Iannini would testify that Bizzozero had deviated from the standard of care in one or more of the ways

---

Bizzozero had departed from the standard of care in his treatment of the decedent.

[11] The plaintiff, however, did not formally withdraw her claims against Waterbury Hospital and Bizzozero until October 2, 2003, and did not file an amended complaint naming only Goldsmith and Stamford Medical Group, P.C., until the conclusion of the evidentiary portion of the trial. The plaintiff eventually disclosed that she had settled with Bizzozero and Waterbury Hospital for $1,250,000 and $675,000, respectively.

[12] The notice provided in relevant part: "Pursuant to General Statutes § [52-572h] et seq., the . . . defendants . . . hereby give notice of their intent to seek an apportionment of liability, if any is found, against . . . Bizzozero. . . . Bizzozero was a defendant in this action and has recently settled the claims against him."

set forth in the plaintiff's complaint and as described in his deposition, which the plaintiff had taken the day before.

Thereafter, on October 28, 2003, the first day of trial, the plaintiff filed a motion in limine, seeking to preclude the defendants from presenting any evidence on the issue of apportionment.[13] In support of her motion, the plaintiff asserted that the defendants should be barred from raising an apportionment claim because they had "made no definitive allegation that sets forth the way or ways in which [they allege] that . . . Bizzozero violated the standard of care."

That same day, the defendants responded to the plaintiff's motion in limine by filing a revised notice of intent to assert a claim of apportionment of liability against Bizzozero. The revised notice set forth with specificity the defendants' claims regarding Bizzozero's alleged negligence.[14] With the exception of the allegation that Bizzozero negligently had failed to evaluate and respond

---

[13] The plaintiff's motion in limine was dated October 24, 2003. The defendants have represented, however, that they did not receive a copy of that motion until it was hand delivered to them on October 28, 2003, the first day of trial. The plaintiff has not challenged this representation by the defendants.

[14] The revised notice of intent to seek an apportionment of liability against Bizzozero provided in relevant part: "Pursuant to General Statutes § [52-527h] et seq., the . . . defendants . . . hereby give notice of their intent to seek an apportionment of liability, if any is found, against . . . Bizzozero. . . . Bizzozero was negligent in one or more of the following ways:

"a. In that he failed to conduct a proper medical screening of [the decedent] prior to his hip surgery in 1994, including failure to obtain adequate history, failure to properly interpret pre-operative EKG readings obtained in 1994 and failure to communicate with [the decedent's] usual primary care provider.

"b. In that he cleared [the decedent] for elective hip surgery when he knew or should have known that it was medically inappropriate to do so.

"c. In that he failed to properly evaluate and respond to the deteriorating condition of [the decedent's] blood after surgery.

"d. In that he failed to properly assess and respond to [the decedent's] cardiac condition after surgery in view of the medical circumstances then existing including the deteriorated condition of [the decedent's] blood."

to the deteriorating condition of the decedent's blood following the decedent's elective hip surgery, the allegations set forth in the defendants' revised notice of intent to seek an apportionment of liability all had been set forth in the plaintiff's complaint.

The trial court granted the plaintiff's motion in limine and precluded the defendants from introducing evidence of apportionment of liability against Bizzozero on the ground that the notice of intent to seek an apportionment of liability was deficient and untimely.[15] In so ruling, the court noted, preliminarily, that General Statutes § 52-102b,[16] the statutory provision governing

---

[15] The trial court granted the plaintiff's motion in limine on the same day it was filed, that is, October 28, 2003, the first day of trial.

[16] General Statutes § 52-102b provides in relevant part: "(a) A defendant in any civil action to which section 52-572h applies may serve a writ, summons and complaint upon a person not a party to the action who is or may be liable pursuant to said section for a proportionate share of the plaintiff's damages in which case the demand for relief shall seek an apportionment of liability. Any such writ, summons and complaint, hereinafter called the apportionment complaint, shall be served within one hundred twenty days of the return date specified in the plaintiff's original complaint. . . . The person upon whom the apportionment complaint is served, hereinafter called the apportionment defendant, shall be a party for all purposes, including all purposes under section 52-572h.

"(b) The apportionment complaint shall be equivalent in all respects to an original writ, summons and complaint . . . . The apportionment defendant shall have available to him all remedies available to an original defendant including the right to assert defenses, set-offs or counterclaims against any party. If the apportionment complaint is served within the time period specified in subsection (a) of this section, no statute of limitation or repose shall be a defense or bar to such claim for apportionment, except that, if the action against the defendant who instituted the apportionment complaint pursuant to subsection (a) of this section is subject to such a defense or bar, the apportionment defendant may plead such a defense or bar to any claim brought by the plaintiff directly against the apportionment defendant pursuant to subsection (d) of this section.

"(c) No person who is immune from liability shall be made an apportionment defendant nor shall such person's liability be considered for apportionment purposes pursuant to section 52-572h. If a defendant claims that the negligence of any person, who was not made a party to the action, was a proximate cause of the plaintiff's injuries or damage and the plaintiff has previously settled or released the plaintiff's claims against such person, then

the procedure for seeking an apportionment of liability under § 52-572h, did not become effective until several months after the plaintiff had filed her complaint in the present action[17] and, therefore, did not dictate the procedure governing the defendants' apportionment claim. In particular, the trial court explained that it was not bound by that part of § 52-102b (c) providing that the notice otherwise required under that statutory subsection for apportionment claims against a defendant who never was a party to the underlying action is *not*

a defendant may cause such person's liability to be apportioned by filing a notice specifically identifying such person by name and last known address and the fact that the plaintiff's claims against such person have been settled or released. Such notice shall also set forth the factual basis of the defendant's claim that the negligence of such person was a proximate cause of the plaintiff's injuries or damages. No such notice shall be required if such person with whom the plaintiff settled or whom the plaintiff released was previously a party to the action.

"(d) Notwithstanding any applicable statute of limitation or repose, the plaintiff may, within sixty days of the return date of the apportionment complaint served pursuant to subsection (a) of this section, assert any claim against the apportionment defendant arising out of the transaction or occurrence that is the subject matter of the original complaint.

"(e) When a counterclaim is asserted against a plaintiff, he may cause a person not a party to the action to be brought in as an apportionment defendant under circumstances which under this section would entitle a defendant to do so.

"(f) This section shall be the exclusive means by which a defendant may add a person who is or may be liable pursuant to section 52-572h for a proportionate share of the plaintiff's damages as a party to the action.

"(g) In no event shall any proportionate share of negligence determined pursuant to subsection (f) of section 52-572h attributable to an apportionment defendant against whom the plaintiff did not assert a claim be reallocated under subsection (g) of said section. Such proportionate share of negligence shall, however, be included in or added to the combined negligence of the person or persons against whom the plaintiff seeks recovery, including persons with whom the plaintiff settled or whom the plaintiff released under subsection (n) of section 52-572h, when comparing any negligence of the plaintiff to other parties and persons under subsection (b) of said section."

[17] Section 52-102b took effect on July 1, 1995, and is applicable to all civil actions filed on or after that date. Public Acts 1995, No. 95-111, § 2. The plaintiff filed her original complaint in the present case on or about March 2, 1995.

required when, as in the present case, the apportionment defendant with whom the plaintiff previously has settled was previously a party to the action.[18] The court then concluded that the defendants had failed to provide the plaintiff with adequate notice of their apportionment claim against Bizzozero. Specifically, with respect to the defendants' July 15, 2003 notice of intent to seek an apportionment of liability, as supplemented by the defendants' expert witness disclosures, the court determined that that notice was inadequate because the facts alleged therein were insufficient to apprise the plaintiff of the defendants' apportionment claim. The court explained that the defendants should have filed an "affirmative pleading" alleging with specificity the manner in which Bizzozero's negligence was a substantial factor in the decedent's death, so that, if necessary, the plaintiff could have conducted additional discovery in regard to those allegations of negligence. With respect to the defendants' revised notice of intent to seek an apportionment of liability filed on October 28, 2003, the court determined that that notice, although factually sufficient, was untimely.[19]

At trial, Payne testified on behalf of the plaintiff that a review of the results of the EKG of the decedent that Goldsmith had administered on December 10, 1993, and the results of a prior EKG of the decedent indicated a significant possibility of life-threatening coronary artery

---

[18] Under § 52-102b (c), a defendant raising an apportionment claim against a person who has settled with or been released by the plaintiff but who was not made a party to the action is required to file a notice that identifies such person and his or her last known address, represents that the plaintiff's claims against that person have been settled or released, and sets forth the factual basis of the defendant's claim that the negligence of such person was a proximate cause of the plaintiff's injuries or damage. See footnote 16 of this opinion.

[19] The next day, the defendants sought reconsideration of the trial court's decision to grant the plaintiff's motion in limine with respect to the issue of apportionment. After a brief hearing, the court denied the defendants' motion for reconsideration.

disease. On the basis of his review of the decedent's records, Payne further opined that Goldsmith's failure to perform additional testing or to refer the decedent to a cardiologist for further testing on December 10, 1993, constituted a deviation from the standard of care and was a substantial factor in causing the decedent's death. In addition, Marsh testified that Goldsmith should have performed additional testing regarding the decedent's coronary health, and that, if such tests had been performed, they likely would have revealed the presence of coronary artery disease.

Goldsmith testified that, prior to the decedent's death, he did not know that the decedent was planning to undergo hip replacement surgery, did not advise the decedent to undergo such surgery and did not provide any medical care to the decedent, including any consultation with other health care providers, while the decedent was admitted to Waterbury Hospital. Goldsmith further testified that, if he had known about the surgery, he would have advised the decedent against it due to the decedent's "unresolved medical problems, including a potentially serious anemia." Finally, Goldsmith testified that Bizzozero neither consulted with him about the decedent nor requested the decedent's medical records prior to the decedent's hip replacement surgery.

The defendants adduced testimony concerning Bizzozero's alleged negligence in support of their claim that Bizzozero's deviation from the standard of care, rather than any negligence by Goldsmith, had caused the decedent's death.[20] In particular, Marsh testified on cross-examination by counsel for the defendants that Bizzozero had deviated from the standard of care and that that deviation was a substantial factor in causing

---

[20] We note that the evidence of Bizzozero's negligence was *not* admitted for the purpose of establishing a claim of apportionment of liability against Bizzozero because, as we have explained, the trial court had barred the defendants from raising such a claim due to inadequate notice.

the decedent's death. In particular, Marsh explained that Bizzozero had been negligent in failing to take a proper medical history of the decedent, in clearing the decedent for surgery, in failing to contact the decedent's primary care provider in order to obtain the decedent's prior EKG results, in failing to transfer the decedent to an intensive care unit or a cardiac care unit, and in failing to transfuse the decedent, who was anemic. Marsh also testified that the decedent's severe anemia was a significant factor contributing to the decedent's death.[21] Iannini, a witness for the defendants, corroborated Marsh's testimony.

At the conclusion of the evidentiary portion of the trial but prior to the court's charge to the jury, the defendants renewed their request for permission to assert an apportionment claim against Bizzozero, seeking a jury instruction on apportionment of liability. The trial court denied the defendants' request for such an instruction and provided the jury with a set of interrogatories relating only to Goldsmith's alleged negligence. Thereafter, the jury rendered a verdict for the plaintiff. In response to the interrogatories, the jury found that Goldsmith's negligence had been a substantial factor in causing the decedent's death in that he had failed to conduct an adequate investigation into the decedent's complaint of chest pain, failed to correlate and consider the decedent's coronary risk factors, dismissed abnormal EKG results, failed to order and obtain a cardiac stress test, failed to diagnose and treat the decedent's coronary artery disease, and failed to consult with or to refer the decedent to a cardiologist.[22] The jury awarded six million dollars in damages to the dece-

---

[21] Payne also testified that the stress of surgery and the decedent's severe anemia had contributed to his death, and noted that neither of those factors or conditions had existed in December, 1993.

[22] The jury rejected the plaintiff's allegations that Goldsmith incorrectly had interpreted the decedent's EKG results and had failed to diagnose his myocardial ischemia.

dent's estate and four million dollars for loss of consortium. The defendants filed a motion to set aside the verdict and a motion for remittitur, both of which the trial court denied. Upon motion by the plaintiff, the court awarded offer of judgment interest[23] of approximately six million dollars pursuant to General Statutes § 52-192a (b).[24] This appeal followed.

On appeal, the defendants contend that the trial court improperly precluded them from asserting a claim for apportionment of liability against Bizzozero. In essence, the defendants maintain that the trial court abused its discretion in concluding that the defendants' notice of intent to seek an apportionment of liability was inadequate.[25] We agree with the defendants.

---

[23] Several years prior to trial, the plaintiff made an offer of judgment directed to Goldsmith only in the amount of one million dollars, which Goldsmith declined to accept.

[24] General Statutes § 52-192a (b) provides: "After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in the plaintiff's 'offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount, computed from the date such offer was filed in actions commenced before October 1, 1981. In those actions commenced on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed with the court if the 'offer of judgment' was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the 'offer of judgment' was filed. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. This section shall not be interpreted to abrogate the contractual rights of any party concerning the recovery of attorney's fees in accordance with the provisions of any written contract between the parties to the action."

[25] The defendants also assert that the last sentence of § 52-102b (c), which relieves a defendant from providing the apportionment notice otherwise required under that statutory subsection, is procedural and clarifying in nature and, therefore, should be applied retroactively. See, e.g., *State* v. *Skakel*, 276 Conn. 633, 680, 888 A.2d 985 (2006) (procedural statutes presumptively retroactive); *Greenwich Hospital* v. *Gavin*, 265 Conn. 511, 520–22, 829 A.2d 810 (2003) (clarifying legislation generally applied retroactively). Prior to trial, the defendants had adverted to the possible retroactive applica-

We begin by setting forth the principles that govern our review of the defendants' claim. "A trial court may entertain a motion in limine made by either party regarding the admission or exclusion of anticipated evidence. . . . The judicial authority may grant the relief sought in the motion or other relief as it may deem appropriate, may deny the motion with or without prejudice to its later renewal, or may reserve decision thereon until a later time in the proceeding. Practice Book § 42-15.[26] . . . [T]he motion in limine . . . has generally been used in Connecticut courts to invoke a trial judge's inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial." (Internal quotation marks omitted.) *State* v. *Gardner*, 96 Conn. App. 42, 52, 899 A.2d 655 (2006). "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must

bility of the last sentence of § 52-102b (c); however, the trial court did not rule on that claim, and the defendants did not pursue it. Accordingly, we decline to consider it on appeal. See Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial").

[26] Practice Book § 42-15 provides: "The judicial authority to whom a matter has been referred for trial may in its discretion entertain a motion in limine made by either party regarding the admission or exclusion of anticipated evidence. Such motion shall be in writing and shall describe the anticipated evidence and the prejudice which may result therefrom. The judicial authority may grant the relief sought in the motion or such other relief as it may deem appropriate, may deny the motion with or without prejudice to its later renewal, or may reserve decision thereon until a later time in the proceeding."

determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Finally, the standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely affected] the result." (Citation omitted; internal quotation marks omitted.) *Smith* v. *Greenwich*, 278 Conn. 428, 446–47, 899 A.2d 563 (2006). "Despite this deferential standard, the trial court's discretion is not absolute. Provided the defendant demonstrates that substantial prejudice or injustice resulted, evidentiary rulings will be overturned on appeal [when] the record reveals that the trial court could not reasonably conclude as it did." *State* v. *Cortes*, 276 Conn. 241, 254, 885 A.2d 153 (2005). We now turn to the merits of the defendants' claim, commencing with a brief history of the applicable statutory scheme.

"This court previously has addressed at length the evolution of Tort Reform I and II, in which the legislature abolished the common-law rule of joint and several liability and replaced it with a system based on principles of comparative fault. See, e.g., *Donner* v. *Kearse*, 234 Conn. 660, 666–69, 662 A.2d 1269 (1995). Prior to October 1, 1986, this state adhered to the rules of joint and several liability with no contribution among joint tortfeasors. . . . [T]herefore, even a defendant whose degree of fault was comparatively small could be held responsible for the entire amount of damages . . . . Partially in response to these concerns, the legislature undertook to reform the tort recovery provisions of our civil system . . . . Tort Reform I provided that each defendant would initially be liable for only that percentage of his negligence that proximately caused the injury, in relation to one hundred percent, that is attributable to each person whose negligent actions were a proximate cause of the damages. . . . Subsequently, one year after Tort Reform I, the legislature enacted Tort Reform

II, which limited the universe [of negligent persons] to only those individuals who were parties to the legal action or who were specifically identified in § 52-572h (n)." (Citation omitted; internal quotation marks omitted) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 23–24, 848 A.2d 418 (2004).

As we also have noted, however, Tort Reform II "overlooked [certain] significant details required to implement effectively the newly created fault apportionment system." Id., 24. Among other things, Tort Reform II did not specify the procedure to be used in asserting an apportionment claim. Indeed, "[t]he confusion spawned by the absence of a statutory method for apportioning liability prompted trial courts to invent varying methods, which often yielded inconsistent results." Id., 25. To remedy this and other problems, the legislature, in 1995, enacted § 52-102b, which delineates the manner in which apportionment claims under § 52-572h are to be brought. See Public Acts 1995, No. 95-111, § 1. As we have explained; see footnote 18 of this opinion; § 52-102b (c) sets forth the notice that is required when a defendant asserts an apportionment claim against a nonparty to the action who has settled with the plaintiff or who has been released from the plaintiff's claims. As we also have explained, § 52-102b (c) expressly provides that no such notice is required if the person with whom the plaintiff has settled or who has been released from the plaintiff's claims previously was a party to the action. The rationale underlying this exception to the notice requirement of § 52-102b (c) is obvious: when the person who has settled with or has been released from the plaintiff's claims previously was a party to the action, the plaintiff needs no special or particularized notice of the defendant's apportionment claim against that person because the plaintiff herself had raised a negligence claim against the same person.

We assume, without deciding, that § 52-102b (c) does not apply to the plaintiff's action. Moreover, prior to the enactment of § 52-102b, the applicable statutory scheme provided no express guidance as to how a defendant should raise an apportionment claim against a party who previously had settled with the plaintiff or who had been released from the plaintiff's claims. Accordingly, we must determine whether the trial court acted in accordance with the purpose and intent of our pre-1995 apportionment scheme in barring the defendants from asserting their apportionment claim against Bizzozero. For the following reasons, we conclude that the trial court abused its discretion in granting the plaintiff's motion in limine because, contrary to the determination of that court, the plaintiff received adequate notice of the defendants' apportionment claim. Furthermore, the defendants were seriously prejudiced by virtue of the trial court's decision to preclude them from presenting that claim.

First, the defendants notified the plaintiff of their intent to assert an apportionment claim against Bizzozero soon after learning that the plaintiff had settled with Bizzozero. This notice was filed on July 15, 2003, approximately three and one-half months prior to the commencement of trial. Although the notice did not explain the factual basis of the apportionment claim, the plaintiff's complaint alleged in detail the manner in which Bizzozero's negligence had caused the decedent's death.

In addition, on or about July 24, 2003, the defendants disclosed two expert witnesses who, along with Goldsmith, would testify in support of the defendants' apportionment claim against Bizzozero. The plaintiff previously had identified each of these witnesses— Marsh and Vanderbush—as expert witnesses in support of her then pending claims against Bizzozero. Thereafter, on September 5, 2003, the defendants disclosed

another expert witness, namely, Payne, who also had been disclosed by the plaintiff as an expert witness. On October 3, 2003, the defendants disclosed another expert witness, namely, Iannini, in connection with their apportionment claim. Unlike Marsh, Vanderbush and Payne, the plaintiff never had disclosed Iannini as an expert but nevertheless had deposed Iannini on October 2, 2003.

Because the plaintiff herself had disclosed Marsh, Vanderbush and Payne as expert witnesses in support of her claims against Bizzozero, she was aware of how each of those physicians would testify with respect to Bizzozero's allegedly negligent treatment of the decedent. Moreover, because the plaintiff's counsel had taken Iannini's deposition on October 2, 2003, the plaintiff also was aware of Iannini's testimony regarding Bizzozero's alleged malpractice. In such circumstances, the plaintiff had ample notice of the defendants' claims regarding Bizzozero's responsibility for the decedent's death.

Moreover, at no time prior to trial did the plaintiff seek to have the defendants provide a more specific statement with respect to the nature of their apportionment claim against Bizzozero. Rather than seeking such a statement, the plaintiff waited until the first day of trial to claim that the defendants should be barred from asserting their apportionment claim due to lack of adequate notice. Even though the plaintiff alleged with specificity in her complaint the various ways in which Bizzozero's negligent treatment of the decedent had been a causal factor in the decedent's death, the defendants provided the plaintiff with a supplemental notice of their apportionment claim against Bizzozero. With the exception of the defendants' contention that Bizzozero had "failed to properly evaluate and respond to the deteriorating condition of [the decedent's] blood after [his hip] surgery"—a theory of negligence appar-

ently raised for the first time in Iannini's October 2, 2003 deposition testimony[27]—the allegations contained in the defendants' supplemental notice tracked the allegations that the plaintiff had made against Bizzozero in her complaint. Thus, the plaintiff had a specific and concise statement of the defendants' allegations against Bizzozero prior to the presentation of any evidence in the case.[28]

Despite this timely notice of the defendants' apportionment claim, the trial court granted the plaintiff's motion in limine, thereby precluding the defendants from raising that claim. In so doing, the court relied on two cases, *Baxter* v. *Cardiology Associates of New Haven, P.C.*, 46 Conn. App. 377, 699 A.2d 271, cert. denied, 243 Conn. 933, 702 A.2d 640 (1997), and *Stowe* v. *McHugh*, 46 Conn. App. 391, 699 A.2d 279, cert. denied, 243 Conn. 932, 701 A.2d 662 (1997). Neither *Baxter* nor *Stowe*, however, supports the court's decision to grant the plaintiff's motion in limine.

---

[27] To the extent that the plaintiff reasonably could have claimed that the defendants had failed to provide her with timely notice of this particular allegation regarding Bizzozero's negligence, the trial court could have precluded the defendants from adducing testimony to that effect from Iannini. Even if we assume, arguendo, that it would have been reasonable for the trial court to have excluded that one aspect of the defendants' apportionment claim, it was not reasonable for the court to have excluded the defendants' apportionment claim in its entirety.

[28] As we previously noted, the trial court indicated that the defendants' July 15, 2003 notice of intent to seek an apportionment of liability was inadequate because, inter alia, the plaintiff was unable to determine, on the basis of that notice, whether to seek additional discovery related to that apportionment claim. We disagree that the notice was inadequate for that reason. Indeed, the plaintiff has failed to identify any additional discovery that she might have sought if the defendants had provided a more detailed notice of intent to seek an apportionment of liability at that time. Moreover, as we have explained, the defendants' notice, as supplemented by their expert witness disclosures, essentially mirrored the allegations of the plaintiff's complaint. The plaintiff cannot complain that she did not have adequate notice of the defendants' apportionment claim against Bizzozero when that claim was predicated on the plaintiff's own allegations of negligence against Bizzozero.

In *Baxter*, Mary Greene Cove was admitted to Yale-New Haven Hospital (hospital) for a cardiac catheterization, during the course of which a blood vessel was perforated. *Baxter* v. *Cardiology Associates of New Haven, P.C.*, supra, 46 Conn. App. 378. Cove ultimately bled to death. Id. Cove's daughter, Maureen Baxter, the executrix of Cove's estate, commenced an action against the hospital, Arthur Seltzer, Cove's cardiologist, Seltzer's medical group, Cardiology Associates of New Haven, P.C. (Cardiology Associates), among others. Id., 378–79. Prior to trial, Baxter settled with all of the defendants except Seltzer and Cardiology Associates. Id. At trial, Seltzer and Cardiology Associates declined to respond to the trial court's repeated inquiries about whether they intended to assert an apportionment claim against the hospital. Id., 380. Seltzer and Cardiology Associates finally acknowledged that they wish to assert an apportionment claim against the hospital during Baxter's examination of her last witness. Id. Thereafter, the trial court barred Seltzer and Cardiology Associates from asserting an apportionment claim against the hospital because Seltzer and Cardiology Associates had failed to give timely notice to the court and to Baxter that they intended to do so, and because Seltzer and Cardiology Associates had presented insufficient evidence from which the jury reasonably could have found that the hospital was negligent in its treatment of Cove. See id., 379–80, 383.

On appeal, the Appellate Court concluded that Seltzer and Cardiology Associates were not entitled to prevail on their claim that the trial court improperly had precluded them from asserting an apportionment claim against the hospital. Id., 383–86. With respect to the untimely notice of apportionment, the Appellate Court noted that, "[a]lthough [Seltzer's and Cardiology Associates'] experts apparently held opinions concerning possible negligence on the part of the hospital, the

disclosures of the nature of their testimony did not indicate that they would testify as to the hospital's negligence." Id., 384. The Appellate Court further observed that Baxter's preparation for trial may have been substantially different if she had known that apportionment against the hospital was an issue in the case. Id., 386. Finally, the Appellate Court explained that, even though Seltzer and Cardiology Associates had apprised Baxter of their apportionment claim at the close of Baxter's case-in-chief, "[a]t that stage in the proceedings, when [Baxter] had already presented her case, it would have been unfairly prejudicial if [Seltzer and Cardiology Associates] had been permitted to claim apportionment against the hospital." Id., 385.

In contrast to the defendants in *Baxter*, the defendants in the present case notified the plaintiff of their intent to seek an apportionment of liability against Bizzozero soon after they became aware that the plaintiff had settled with Bizzozero, more than three months prior to trial. In addition, very shortly thereafter, the defendants disclosed two expert witnesses in support of their apportionment claim. The defendants disclosed a third expert approximately two months before trial and disclosed a fourth expert almost a full month before trial. The plaintiff was well aware of the fourth expert's testimony because counsel for the plaintiff had deposed him the day before. In view of these material differences between *Baxter* and the present case, the trial court's reliance on *Baxter* was misplaced.

*Stowe* is similarly inapposite. In *Stowe*, the plaintiff, Harold Stowe, brought a medical malpractice action against the defendant, John McHugh, a podiatrist, who had removed a nail from one of Stowe's toes. *Stowe* v. *McHugh*, supra, 46 Conn. App. 392–93. Stowe alleged that, as a result of McHugh's negligence in performing that procedure, he had contracted an infection in his right leg which ultimately required his admission to

Waterbury Hospital, where his right hip prosthesis was removed. Id., 393. Thereafter, McHugh filed a motion to add Waterbury Hospital and three physicians as apportionment defendants, claiming that their alleged negligent treatment of Stowe had caused his injuries. Id. The trial court granted McHugh's motion. Id. Thereafter, however, the apportionment defendants filed motions for summary judgment, claiming that McHugh had failed to disclose a qualified expert who could testify concerning their alleged deviation from the applicable standard of care. Id. The trial court granted the apportionment defendants' motions for summary judgment. Id., 394.

On appeal, McHugh maintained that he was not required to disclose an expert because the apportionment defendants were parties in name only and he was not seeking any relief from them other than apportionment. See id. Alternatively, McHugh asserted that his affidavit and the affidavit of a second podiatrist, Harold Harinstein, were sufficient to support McHugh's claims against the apportionment defendants. See id., 395–96. The Appellate Court affirmed the judgment of the trial court; id., 398; concluding, inter alia, that expert testimony was required on the issue of the apportionment defendants' proportional share of liability and that neither McHugh nor Harinstein was qualified to testify regarding the apportionment defendants' allegedly negligent treatment of Stowe. Id., 395, 396–97.

Like *Baxter*, *Stowe* has no bearing on the present case. *Stowe* merely held that expert testimony is necessary when, as in the present case, a claim has been raised alleging medical malpractice. Id., 395. The issue addressed by the plaintiff's motion in limine in the present case was not the requirement of expert medical testimony but, rather, the adequacy of the notice that the defendants had provided to the plaintiff regarding their apportionment claim. Consequently, the trial court

improperly relied on *Stowe* in precluding the defendants from raising their apportionment claim against Bizzozero.

Furthermore, even though § 52-102b may not apply retroactively to the present action; see footnote 25 of this opinion; the trial court should have given due weight to that provision in evaluating the adequacy of the defendants' notice of their apportionment claim. As we have indicated, prior to 1995, our statutes pertaining to apportionment of liability were silent as to any requirement of notice. In 1995, however, the legislature made it clear that, although a defendant asserting a claim of apportionment against a person who had not been made a party to the action is required to set forth with specificity the factual basis of his or her apportionment claim, that notice is not required when the person against whom apportionment is sought previously was a party to the action. See General Statutes § 52-102b (c). At a minimum, the trial court should have been guided, as a matter of common-law adjudication, by the clearly stated policy reflected in the 1995 enactment of § 52-102b, namely, that particularized notice is unnecessary when the plaintiff already has raised a claim that the negligence of the person against whom apportionment is sought was a proximate cause of the plaintiff's or other person's injuries.[29] See *Bhinder* v. *Sun Co.*, 246 Conn. 223, 235, 717 A.2d 202 (1998) ("[w]e have previously used statutes as a useful source of policy for common law adjudication, particularly if there [is] a close relationship between the statutory and common law subject matters" [internal quotation marks omitted]); see also R. Newman & J. Wildstein, Tort Remedies in Connecticut (1996) § 28-6 (d) (1) (iv), p. 401 ("[t]he authors believe that the courts should look to [§ 52-

---

[29] Instead, the trial court expressed its disagreement with the relevant statutory language, characterizing it as "bad legislation" that is "going to be a problem down the road."

102b] for guidance in determining the correct procedure for cases filed before [the effective] date [of that statute]").

Finally, the trial court's decision to preclude the defendants from asserting their apportionment claim was highly prejudicial. Because the trial court prohibited the defendants from seeking to allocate Bizzozero's percentage of negligence, the defendants were unable to establish that their own exposure should be reduced in accordance with Bizzozero's proportionate share of responsibility. As we have stated in a markedly similar context, "to require [a] defendant to pay the entire amount of damages assessed by the jury in [a] multitort-feasor situation without apportionment taking place essentially [is] a reversion to the common law of joint and several liability, which was abolished by Tort Reform I and Tort Reform II, and in particular, by § 52-572h." *Collins* v. *Colonial Penn Ins. Co.*, 257 Conn. 718, 739, 778 A.2d 899 (2001). Because the defendants were entitled by statute to pay only their proportionate share of the damages; see General Statutes § 52-572h; and because the trial court improperly prohibited the defendants from demonstrating that Bizzozero was at least partially responsible for the decedent's death, the trial court's decision to bar the defendants from asserting their apportionment claim was harmful. The defendants, therefore, are entitled to a new trial.[30]

---

[30] We note, moreover, that the plaintiff received a double recovery as a result of the trial court's decision to grant her motion in limine. The plaintiff settled her claim with Bizzozero for $1,250,000 and then, by virtue of the jury verdict, recovered the full amount of her damages against the defendants. Such a recovery is disfavored. As this court has stated, "[t]he rule precluding double recovery is a simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury." (Internal quotation marks omitted.) *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 22 n.6, 699 A.2d 964 (1997). "Connecticut courts consistently have upheld and endorsed the principle that a litigant may recover just damages for the same loss only once. The social policy behind this concept is that it is a waste of society's economic resources to do more than compensate an injured party for a loss and, therefore, that the judicial

Without conceding that the defendants are entitled to a new trial, the plaintiff maintains that any retrial should be limited to the issue of damages. In support of her contention, the plaintiff asserts that the jury reasonably and properly determined that the defendants were liable for the decedent's death, and that, in the present case, the issue of liability and the issue of damages are entirely separate and distinct, such that the scope of any retrial should be limited to a determination of the percentage of liability attributable to the defendants.

"Ordinarily the reversal of a jury verdict requires a new trial of all the issues in the case. . . . In other words, [a]n order restricting the issues [of a new trial] is the exception, not the rule." (Citation omitted; internal quotation marks omitted.) *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 450, 782 A.2d 87 (2001). When, however, "the error as to one issue . . . is separable from the general issues, the new trial may be limited to the error found, provided that such qualification or limitation does not work injustice to the other issues or the case as a whole. . . . But [when] the retrial of the single issue may affect the other issues to the prejudice of either party, the court will not exercise its discretion in limiting the new trial but will grant it de novo." (Citation omitted; internal quotation marks omitted.) *George* v. *Ericson*, 250 Conn. 312, 332, 736 A.2d 889 (1999). Thus, "[t]he decision to retain the jury verdict on the issue of liability and order a rehearing to determine only the issue of damages should never be made unless the court can clearly see that this is the way of doing justice in [a] case. . . . As a rule the issues are interwoven, and may not be separated

machinery should not be engaged in shifting a loss in order to create such an economic waste." (Internal quotation marks omitted.) *Rowe* v. *Goulet*, 89 Conn. App. 836, 849, 875 A.2d 564 (2005).

without injustice to one of the parties." (Citation omitted; internal quotation marks omitted.) Id., 332–33.

We are not persuaded that the present case constitutes an exception to the general rule that a judgment ordering a new trial ordinarily requires a rehearing on both liability and damages. Because the trial court foreclosed the defendants from raising an apportionment claim against Bizzozero, the defendants had no choice but to try the case on the theory that they simply were not liable—even to the slightest degree—for the decedent's death. Indeed, the defendants effectively were foreclosed from raising the alternative argument that, even if they had been liable for the decedent's death, Bizzozero's liability was far greater than their own. Rather, the defendants were forced to insist that they were not liable at all, a strategy that played into the hands of the plaintiff, who argued to the jury that the defendants simply were trying to "pass the buck" to Bizzozero and others who no longer were parties to the action.

Moreover, as the defendants note, this court recently abolished the doctrine of superseding cause; *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 446, 820 A.2d 258 (2003); a doctrine that had applied to situations in which a defendant claimed that a subsequent negligent act by a third party cut off its own liability for the plaintiff's injuries. See id., 436. We did so because, inter alia, our statutes allow for apportionment among negligent defendants. Id., 436–39. In the present case, however, the defendants were precluded from asserting an apportionment claim against Bizzozero *and* deprived of the opportunity to establish that Bizzozero's negligence was a factor contributing to the decedent's death. In such circumstances, we are unable "*clearly* [to] see that [a trial limited to damages] is the way of doing justice" in the present case. (Emphasis in original; internal quo-

tation marks omitted.) *George* v. *Ericson*, supra, 250 Conn. 333.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.